LaRamoee, Judge,
delivered the opinion of the court:
This action arises out of a contract between the plaintiff and the Army Quartermaster Corps, involving the assembly of combat rations (hereinafter referred to as C rations) for the Armed Forces during the Korean conflict. Plaintiff seeks damages under alternative theories of breach of contract, or termination of the original written contract giving rise to an implied contract. The defendant has counterclaimed for the value of certain Government-furnished components allegedly lost or damaged by the plaintiff during the performance of the contract in excess of contract tolerances.
After a protracted trial, a commissioner of this court has submitted 171 findings of fact to the court, to which the plaintiff has briefly excepted, and to which the defendant has filed voluminous exceptions. The trial transcript is 2,883 pages long, and there are over 200 exhibits in this case. To discuss each exception in this opinion would require an unwarranted expenditure of time and printing expense. We have, however, carefully considered each exception presented by an exhaustive study of the exception in light of the testimony and exhibits, and we conclude that the trial commissioner’s findings are almost fully supported by the evidence. Where an exception was deemed to be well taken, either in whole or in part, the finding was accordingly changed.
On April 26, 1951, plaintiff entered into a contract with the defendant, as of April 4, 1951, whereby it was to receive $347,633 for assembling 4,420,000 C rations, using components and packaging materials, substantially all of which were to be furnished by defendant. The Government entered into independent contracts with various manufacturers and suppliers relative to these components and items. At about the same time plaintiff’s contract was awarded, similar contracts, under the same procurement directive, were awarded to some six other firms. In all, 38 million rations were to be assembled under the directive.
*192 The delivery schedule provided for the delivery of 20 percent of the completed rations on or before June 30,1951, and 20 percent monthly thereafter, to and including October 1951.
The Government-furnished property (hereinafter referred to as GFP) was scheduled for delivery to the contractor’s plant at 12yz percent on or before May 20, 1951, and. 1214 percent semimonthly thereafter until September 5, 1951. By June 5,1951, almost one-third of all components required for assembly under plaintiff’s contract had been shipped to plaintiff by the Government suppliers.
On June 5, 1951, the contracting officer, pursuant to instructions from Washington, sent plaintiff the following “stop-order.”
Bequest that no action be taken to begin final assembly until further notice. Sub-assemblies can be started when you desire.
On June 15, 1951, plaintiff was advised that the tentative earliest starting date for final assembly would be July 16. On July 9, plaintiff was authorized to commence final assembly on July 16.
On July 10,1951, the plaintiff wrote the contracting officer giving notice of a claim for adjustment and advising that such claim would be submitted as soon as costs were ascertainable. No price adjustment was agreed upon during the performance of the work.
On January 7, 1952, prior to the completion of the C ration assembly, the plaintiff submitted to the contracting officer a claim for $144,233.30 as increased costs resulting from the delay of 56 days by the stop-order, and the defective components furnished by the Government. On April 25, 1952, plaintiff submitted its revised claim for $448,270.01 with detailed schedules covering excess costs claimed.
On July 20, 1953, plaintiff filed its petition in this court. Eleven days later, the successor contracting officer issued his findings of fact, and thereafter plaintiff filed a perfunctory appeal to the Secretary of the Army, but took no action on this appeal.
A more detailed account of the facts relative to each facet of the case will appear in context. The questions *193 presented in the case are: (1) Whether the stop-order of June 5, 1951, was justified under the circumstances; (2) Whether the stop-order was a termination in whole or in part of the contract, or whether it constituted a breach of the original contract.; (3) If plaintiff is entitled to recover, should recovery be based on its theory of termination and implied contract, or on its theory of breach of contract; (4) Whether the plaintiff has failed to exhaust its administrative remedies; (5) Whether plaintiff is liable to defendant on the counterclaims; (6) Whether the decision of the Armed Services Board of Contract Appeals on the infestation claim is supported by substantial evidence, and whether the evidence adduced at the trial de novo here substantially supports that determination; (7) If plaintiff is entitled to recover, in what amount and on which items should recovery be granted.
It is clear, and the defendant admits as much at page 11 of its brief, that if the stop-order was unjustified, it was a breach of the contract and plaintiff is entitled to such damages as flowed from it.
The procurement directive pursuant to which plaintiff’s contract was let, was issued on February 13,1951. The contract was dated April 26,1951, and entered into as of April 4, 1951.
The first delivery was to be made by the plaintiff on or before June 30. The delivery of components began to arrive at plaintiff’s plant by the end of April 1951. By June 5, 1951, almost one-third of all components required for assembly under plaintiff’s contract had been shipped by suppliers under contracts with the Chicago Depot Quartermaster’s Purchasing Division. By this date, substantial shipments (38 percent of the overall meat components) had been made for 10 of the 11 items of canned meat components specified in the contract. The only meat component that had not been shipped was hamburgers and gravy. The first shipment of this item wras made July 16, and was not received until July 25.
On June 2, 1951, the following telegram was sent from the Office of the Quartermaster Corps in Washington to the *194 Chicago Quartermaster Depot, through which the contract in question had been let:
Confirming instructions given this date to Colonel Hirschhorn and Captain Brines. Due to difficulties in procurement of canned meats and the inability of this office to effect an immediate solution for the supply thereof, it is desired that you take immediate action to reset the assembly program for operational rations so as to begin on or about 16 July. The date to be variable as found best suited to the supply of components. If adequate arrangements can be concluded in the near future for the supply of operational meats you will be advised accordingly. Colonel Hirschhorn has been furnished with data regarding supply position of the QMC with regard to operational rations. Purpose of furnishing this data is to assure you that at present ample supplies are on hand to meet commitments for the immediate future. General Feldman and Colonel Hollis have approved the above plan.
The stop-order was issued pursuant to the above telegram. There was, in fact, no shortage of slaughter cattle during the period of plaintiff’s contract. The Army did not procure any of the meat for canners who were supplying the canned meat components for plaintiff’s contract.
The situation described in the telegram of June 2, 1951, to the Quartermaster Depot in Chicago had prevailed since January 1951, and was particularly apparent by February and March 1951, before the award of plaintiff’s assembly contract.
The Office of Price Stabilization (OPS) had established a freeze of prices for each establishment engaged in meat production in December 1950, and about April 1951 established ceiling prices in all categories. The packers, and the boners with whom canning contractors had placed orders for their meat supply, were under a price squeeze between the cost of livestock and the OPS ceiling prices. While cattle was available for slaughter, little was made available for market because of the price situation.
The commissioner has found, and we think correctly so, that the real reason for the decision to hold up the assembly program was that the pipelines were full.
The defendant contends that in any event, either because of the Army’s difficulties with meat or because the pipelines *195 were full, the stop-order was justified under the circumstances. We cannot agree. Had the meat situation not been apparent when the contract was awarded to plaintiff, we might have deemed the stop-order justified, but whether the defendant based its action on the meat situation, or on the fact that the pipelines were full of C rations is of little moment. In either event the determined necessity for the delay stemmed from poor planning on the defendant’s part, and we do not think plaintiff should be made to pay for defendant’s miscalculations.
When plaintiff was given the green light on July 16, it still had not received any canned hamburgers, although there was some evidence in the record indicating that this component was available. Plaintiff was authorized to commence final assembly with the components that were on hand on June 5. If plaintiff was able to begin final assembly on July 16, substituting other meat components for the hamburger, it could have done the same as early as June 5.
To this defendant replies that the plaintiff was not ready to commence the sub-assembly of B-units until June 22, and the final assembly operations were ready to start about the end of June. However, plaintiff had already received the stop-order, and had no reason to rush its preparations. There is nothing in the record to indicate that plaintiff could not have been ready to start operations earlier.
Plaintiff urges that the stop-order was not only unjustified, but under the Contract Settlement Act of 1944, 58 Stat. 649, 41 U.S.C. 101, it can be treated as a termination. The plaintiff’s reason for advancing this theory is obvious. Under the theory of termination and subsequent performance under an implied contract, plaintiff could recover considerably more than it could under the breach theory.
Section 111 (b) of the Act provides that:
(b) Whenever a contracting agency hereafter directs a prime contractor to cease or suspend all or a substantial part of the work under a prime contract, without terminating the contract, then, unless the contract provides otherwise, (1) the contracting agency shall compensate the contractor for reasonable costs and expenses resulting from such cessation or suspension, and (2) if the cessation or suspension extends for thirty days or *196 more, the contractor may elect to treat it as a termination by delivering written notice of his election to do so t.o the contracting agency, at any time before the contracting agency directs the prime contractor to resume work under the contract.
Plaintiff’s termination theory is defeated by the very statutory language it relies on. Section 111 (b) allows the contractor to elect to treat a suspension or cessation of 30 days or more as a termination by delivering written notice to the contracting agency, at any time before the contracting agency directs the prime contractor to resume work under the contract. Plaintiff received authorization to start assembly on July 16, by telegram on July 9. The next day, July 10, plaintiff wrote defendant the letter that it claims notified the contracting agency of its election to treat the suspension as a termination. The statute provides for notice at any time befoz’e the contractor is directed to resume work, not at any time before the date of resumption.
Furthermore, plaintiff went forward with the work specified in the original contract, was paid and accepted payment as per the original contract, and it is now too late for the plaintiff to complain that the stop-order effected a change not authorized by the contract.
Inasmuch as we find that the stop-order was not justified, if plaintiff is to recover, recovery will be based on the theory of breach of contract.
Defendant contends that in any event plaintiff cannot recover because of failure to exhaust its administrative remedies.
Plaintiff’s first claim for increased costs was filed on January 7, 1952, prior to the completion of its work. A revised claim was submitted on April 25, 1952. By July 20, 1953, neither the contracting officer nor his successor had issued findings on the claim, and plaintiff filed its petition in this court. Eleven days thereafter, the successor contracting officer issued his findings of fact, and plaintiff filed a perfunctory appeal with the Secretary of the Army, taking no action thereon.
While recognizing that the claim in question was not an easy one to resolve, and that conferences between the parties *197 delayed the ordinary procedure somewhat, we nevertheless think that the defendant took an unreasonable amount of time in issuing its findings. The plaintiff was fully justified in commencing this action when it did, and defendant cannot be heard to complain that the plaintiff should have suspended proceedings in this court and completed the administrative steps, when defendant’s own action or lack thereof prompted plaintiff to bypass the normal administrative sequence and commence this suit.
Under its alternative theory of breach of contract, plaintiff claims that its damages are not less than $298,962.43. The excess costs and losses are based on the stop-order, and also on the alleged excessive number of defective components, the handling of which ostensibly increased plaintiff’s costs, and the costs of Canova Foods, Inc., a wholly owned subsidiary of plaintiff that performed one of the subassemblies.
The original contract called for the delivery of the completed rations during the months of June through October, 1951, a period of 153 calendar days. Plaintiff’s actual delivery was completed January 24, 1952, a period of 238 calendar days from June 1, 1951. The commissioner has found that it is reasonable to conclude that the delay in the final delivery of C rations was attributable to the stop order deferring the final assembly to July 16, 1951, and to the excessive number of defective components which required screening and salvage operations to avoid assembling unsuitable components. The delay of 85 days in delivery of the completed rations represents 35.71 percent of the total delivery period from June 1,1951.
The nature of most of the excess costs and losses here involved was such that it is impossible to determine with exactitude the damages suffered by the plaintiff. That damages may not be definitely ascertained does not preclude recovery, however, where the fact of damage is clearly established, and a reasonable basis of computation is afforded. Storey Parchment v. United States, 126 Ct. Cl. 713, 721; Needles v. United States, 101 Ct. Cl. 535; Penker Construction Co. v. United States, 96 Ct. Cl. 1, 56.
*198 The commissioner has found that a fair and reasonable approximation of plaintiff’s increased costs and losses is $194,374.40, broken down as follows:
Storage, switching and other direct costs_$36,154.25
Increased direct labor_ 78,758. 06
Apportionment of other assembly costs_ 6, 844. 51
Apportionment of indirect costs:
Main plant_ 41,421. 01
Canova Foods, Inc_ 9, 739.45
Net loss of the rental value of buildings- 13,217. 74
Loss on sale of waste_ 4,039. 38
Fumigation cost_ 4,200. 00
Total_ 194,374.40
While avoiding discussion, as much as possible, of the myriad of facts upon which the commissioner based his determination, we will consider each item of increased cost or loss he has set out.
Outside storage and certain other costs relate wholly to the delay in the assembly and outflow of completed rations, whereas indirect costs are allocable to the period of 85 days of delay represented by the percentage thereof to the entire delivery period.
The plaintiff rented outside warehouses commencing about June 8, 1951, and. continuing mitil December 1951, at an actual cost of $27,051.86.
The plaintiff’s payments for switching and demurrage charges in diverting incoming shipments to outside warehouses and transferring such components and materials back to the main plant for assembly amounted to $7,112.02.
The cost of additional packing cases for the temporary storage of B-units assembled prior to July 16,1951, tarpaulins for outside temporary protection of GFP at the loading docks, extra heating equipment for the assembly room and photos of defective GFP received, amounted to $1,990.37.
These items amount to $36,154.25.
The Government takes the position that a provision of the contract precludes recovery for outside storage, switching, and demurrage charges. The pertinent portion of the contract provision is as follows:
However, the contractor warrants and agrees that it has available sufficient storage space for the storage of the entire quantity of the Government-Furnished Prop *199 erty (including packaging materials) and will, if required, store ana handle the entire quantity of said Government-Furnished Property at no cost to the Government irrespective of this Schedule, during the entire life of the contract and for an additional ninety (90) days thereafter.
Absent the stop-order and excessive number of defective components, we would agree with defendant’s position. On the facts before us, however, we do not think the proviso is a defense. The stop-order, which we have held is a breach of contract, gave rise to the necessity for storing many more components at one time than the parties could have contemplated when they entered into the contract. The normal expectation was for plaintiff to start assembling the components upon or shortly after receipt, and to ship the rations when completed. As it turned out, plaintiff had to receive and store the components for a considerable period of time before it was allowed to begin its assembly work. Then too, it cannot be overlooked that prior to the award of the contract, one of defendant’s representatives determined that plaintiff had ample space for storage.
The commissioner has allowed $198.91, the cost of photos of defective and infested components received, as a proper item of damages. We agree with defendant’s contention that this item is not a proper cost item. Since the contracting officer had refused to investigate a situation that plaintiff complained of, plaintiff obviously had the photos taken with an eye to a future claim or to future litigation.
The plaintiff’s greatest additional costs were incurred for the direct labor engaged in screening and rehandling of components and packaging materials. Most of this work was performed by employees in the assembly lines, but much of the additional labor cost represented the salaries of warehouse workers and other employees who were specifically assigned to screening and salvage operations of components which were found to contain such a great number of defects that they could not be handled in the lines. The cost for the additional employees would not comprise all of plaintiff’s increased costs of such labor, because of the slowdown in the output of the entire assembly lines. An accurate deter-. *200 mination of such increased labor costs is not possible of determination.
The commissioner has found that a fair and reasonable determination of such increased costs may be measured by the increase of plaintiff’s direct labor costs over its original estimate, as follows:

Actual direct labor costs:

In tlie main plant assemblies_$244,086. 02
By Canova Foods, Inc. (Accessory bags)_ 40,383.19 $284,469.21

Original estimate of direct labor:

4,617,390 O rations @ $.04525_ 208,936.90
Less labor applicable to the plastic spoons excluded in 3,225,750 rations- —3,225.75 205,711.15
Increased cost of direct labor- 78, 758. 06
The defendant argues that the plaintiff has magnified the difficulties actually encountered in assembling the rations and in fact contributed to some of them. The defendant also argues that plaintiff’s direct labor cost figure, as estimated, was too low.
It is of course within the realm of possibility that both these contentions are correct, but we do not think that the record bears them out.
As we said in F.H. McGraw and Company v. United States, 131 Ct. Cl. 501, 511, the method of proving damages outlined above is by no means satisfactory, because, among other things, it assumes plaintiff’s costs were reasonable and that plaintiff was not responsible for any increase in cost, and because it assumes plaintiff’s bid was accurately computed which is not always the case, by any means. But, when as here, the contracting officer has not made a finding as to equitable adjustment prior to the suit, where there is nothing in the record to show that plaintiff’s bid was too low, and where it has not been proved that plaintiff’s costs were unreasonable, or that plaintiff was itself responsible for any increased costs, we have no alternative.
It may well be as plaintiff contends, that absent the stop-order and excessive defects in components, it would have improved on its direct labor estimate.
*201 As we have said above, we view basing damages on the difference between bid estimate and actual costs with trepidation. We see no basis for carrying this even further, as plaintiff contends for, and basing damages on the difference between its “engineered” costs (lower than its bid estimate) and actual costs.
There is one item of direct labor cost that cannot properly be allowed as damages. This was an additional strapping cost.
The plaintiff experienced some difficulty in obtaining production in strapping the packing cases of six completed rations. The contract specifications required that these shipping cases be bound with a flat steel strap for export shipments.
On August 30, 1951, the plaintiff requested a waiver of the specification for steel strapping with permission to use a 16-gauge 70 to 90 psi round wire which could be handled by a semi-automatic strapping machine, in order to speed up production. The contracting officer denied any deviation from the specifications on strapping of the shipping cases.
In order to avoid an accumulation of completed rations, the plaintiff’s strapping employees worked one-half hour extra per day and 8 hours on Saturday, for which plaintiff paid premium pay for overtime. From July to December 1951, the plaintiff’s strapping employees performed work on 9 Saturdays.
The commissioner has found that the increased cost represented by the premium pay for strappers was only a nominal sum, amounting to less than $300. Since the contracting officer was within his rights in denying the deviation, the defendant is not liable for the additional cost incurred. In the absence of a specific amount for this item, we think it fair to reduce plaintiff’s increased cost of direct labor by $300.
Certain plant costs incurred in the assembly of C rations and directly assignable to such costs were proportionately increased by reason of the delay of 85 days in completing the delivery of C rations, which include the following:
*202 Depreciation of assembly equipment-$9,200. 75
Supplies and line service- 4,293. 92
Rental of maciiines- 2,755.36
Sundry assembly expense- 2,416. 90
Pest control___ 500.00
Total_19,166.93
A reasonable portion attributable to the delay of 85 days is 35.71 percent thereof, or the sum of $6,844.51.
A fair and reasonable portion of the indirect costs at plaintiff’s main plant attributable to defendant’s delay of 85 days is 35.71 percent of $115,992.76, or the sum of $41,421.01.
The amount applicable to the Canova Foods, Inc. plant in the assembly of accessory bags is 35.71 percent • of $27,273.73 or the sum of $9,739.45.
The plaintiff’s mam building contained 7 floors with an area of 27,000 square feet on each floor. Five floors of this building, covering 135,000 square feet, were regularly occupied during the performance period for the storage and assembly of C rations. The fair and reasonable rental value of plaintiff1’s type of building in Memphis, during the period of the C ration assembly, was 40 cents a square foot, or $54,-000 per annum for the 5 floors occupied. The average daily rate was $147.95 and the amount applicable to the delay period of 85 days is the sum of $12,575.75.
The plaintiff acquired the Ballard building on June 15, 1951. It was directly across the street from plaintiff’s main building and was utilized as convenient storage for GFP until about the end of December 1951, along with other outside storage warehouses. In addition to other outside storage the Ballard building was required for storage of GFP because of the great accumulation of shipments during the period prior to July 16, 1951. Its use was continued until December 1951, because of delay in the assembly operations, resulting from packing of oversized crackers, infested and defective components. The fair and reasonable rental value of the Ballard building for storage purposes was $266.67 per month, and the plaintiff had paid $135 rent for the first half of June 1951. The rental value for the storage use of this building, from June 15 to December 31, 1951, was $1,733.35.
*203 The fair and reasonable value for the use of the plaintiff’s main building for the period of 85 days of delay, and for its Ballard building as additional storage, is the sum of $14,309.10. Since depreciation of $1,091.36 on these buildings has been apportioned to the delay period in arriving at indirect costs, the net loss of the use of these buildings is the sum of $13,217.74.
The contract provided that all packing materials in which GFP was shipped to plaintiff, would vest in the plaintiff, and this material was sold as waste. The market price of this type of waste dropped substantially after October 1951. Plaintiff’s final sale of waste was made January 21, 1952. Because of delays attributable to the defendant, the plaintiff sustained a loss on a portion of these materials sold after October 1951, in the amount of $4,039.38.
The plaintiff paid the Orkin Exterminating Company $4,200 for fumigating its entire plant in June 1952, after the building was substantially cleared of all GFP. This cost was necessary because of infested cookies and crackers received as GFP that were stored in the building during 1951.
Plaintiff argues that the total damages determined by the commissioner are inadequate, in that the net result would be as follows:
Amount previously paid_$860,081.24
Damages determined_ 194,874.40
Total proposed payments_ 654, 455. 64
Less: Total costs oí performance_ 525, 931. 32
Excess of payments over costs_ 28, 524. 32
The $28,524.32 excess over costs, plaintiff contends, would not even reimburse plaintiff for its loss of anticipated profits of $46,173.90. Under either of the alternative theories advanced in its claim, plaintiff thinks its recovery should be at least as follows:
Loss determined by commissioner_$165, 850. 09
Reasonable profit- 76, 575. 60
Interest on borrowed capital allocable to ration_ 25,959.56
Reasonable rental value of buildings_ 30, 577.18
Total. 298, 962.43
*204 In addition plaintiff, under the termination claim, thinks itself entitled to recover reasonable costs of settlement, the undepreciated cost of special equipment purchased for the ration assembly, and interest on the recovery at 2% percent per annum as provided by law.
As to these items, our holding that plaintiff’s termination theory is without merit precludes recovery on them.
Plaintiff is unquestionably correct when it states that the loss of reasonably anticipated profits is a recoverable item of damages. However, in a suit for breach of contract, plaintiff is not entitled to profit on the amount of its damages. Torres v. United States, 126 Ct. Cl. 76.
At most, the profits to which plaintiff is entitled is $46,173.90. The commissioner has found that a reasonable profit allowance on this contract would be 10 percent. Based on the original contract price of $347,633, this would be $34,763.30. Because the excess payments over costs is not too far from this, and because there is no way of knowing whether or not plaintiff would have realized the profit it expected had the contract been performed as originally provided, we see no basis for adding an amount to compensate for loss of profits.
Plaintiff takes the position that it is entitled to recover $25,959.56 for interest on borrowed capital allocable to the ration assembly on the same basis as other general administrative expenses. We have found no interest or discount expense is allocable to the ration assembly expense (finding 138). Hence, we need not decide whether such interest would be recoverable.
And lastly, plaintiff claims that the reasonable rental value of its buildings is $30,577.18, and not $13,217.74 as found by the commissioner. This claim is based on the rental value of the buildings for seven months, the entire period of conti'act performance. The commissioner’s finding is based on the determined 85-day delay.
It cannot be seriously contended that plaintiff is entitled to recover the reasonable rental value of buildings it used for the purpose of voluntarily performing a contract with the Government. When the Government causes a contractor to lose the use of its property by delaying the contract per *205 formance, then only is it liable for the damages caused by the delay.
The Government has counterclaimed for the value of GFP allegedly lost or damaged by the plaintiff during performance of the contract. The largest item of the counterclaim is $89,611.10 as the fair market value of cookies and crackers which were found unfit for use in the C rations because of infestation, less $104.02 recovered on sales of a small portion thereof, and an estimated salvage value of $1,029.00 for the remainder.
The infestation of cookies was first discovered and reported by plaintiff’s employees on the assembly line for B-units about October 5, 1951. The infestation consisted primarily of the presence of an insect known as the sawtooth beetle or grain beetle. The infestation of crackers was fix’st discovered on the assembly line about November 9, 1951. Immediately upon the discovery of infested cases of these bakery goods the entire lots being assembled were withdrawn, and thereafter a thorough inspection was made of each lot before it was brought to the assembly line.
By September 10, 1951, the entire contract requirements of cookies and crackers had been shipped to the plaintiff by suppliers. By October 5, 1951, when infested cookies were first discovered, the plaintiff had completed 1,952,119 rations or approximately 42 percent of the total number ultimately assembled.
Following the discovery of infestation in these bakery products, the plaintiff inspected all cookies and crackers remaining in storage, under the supervision of Government inspectors. The inspection was conducted on the fourth floor of plaintiff’s building. The examination was performed by lots, sample cases being selected at random from the various lots of stored cookie and cracker components and a 100 percent inspection was made of the selected cases. The operation required the opening of each case and the emptying of the contents thereof upon an inspection table, the examination of the contents and cases, and their repacking.
As a result of this inspection the Depot Veterinary Inspector condemned as unfit for use approximately 366,822 *206 pounds of crackers and 151,293 pounds of cookies, and the plaintiff was furnished “turn-in” slips for its accountability for these items of GFP. Except for approximately 5,175 pounds that were sold locally by the Memphis General Depot as not fit for human consumption, these crackers and cookies were donated and shipped to the Federal Penitentiary at Atlanta during November and December 1951.
Two carloads of replacement cookies shipped to plaintiff by another assembler which had completed its contract were found to be infested when inspected upon arrival, and three carloads of replacement cookies from the Chicago Quartermaster Depot were also partially infested upon arrival at plaintiff’s plant.
On October 30, 1951, a board was appointed to investigate and determine the facts involving the insect infestation of the cookies stored in the Oliver-Finnie Company assembly plant. This board consisted of one officer, Maj. William O. Bradley, who arrived at plaintiff’s plant about November 8, 1951. His investigation was concluded December 11, 1951, and he found that the infested cookies consisted of 6,567 cases with a total weight of 143,157 pounds which were unfit for ration assembly. This report concluded: “Based upon the evidence presently available, the board is unable to fix responsibility for the insect infestation.”
Pending determination of the cause of infestation, the Government withheld $70,000 due to plaintiff on current vouchers. Payments due other contractors were also withheld for the same reason.
A memorandum dated December 13, 1951, by Col. William E. Pheris, Chief of the Procurement Branch, Supply Division of the Office of the Quartermaster General, on the subject of the release of funds, states in part:
Captain Baker, the contracting officer on subject contracts, recommended that on the basis of the findings made by the investigating officers assigned to investigate weevil infestations under subject contracts, that “Based upon the evidence presently available, the Board is unable to fix responsibility for the insect infestation” which recommendation was made with respect to each contract, that the funds which were withheld pending such investigation be released to subject contractors. This recom *207 mendation was approved by Colonel Pberis and the funds were ordered released.
About the same time the plaintiff was advised that the amounts due on its current vouchers would be released for payment.
A report of “Survey” dated March 3, 1952, was thereafter issued in respect to the- salvage of 151,293 pounds of cookies and 366,822 pounds of crackers that had been furnished as GFP components for assembly by the plaintiff. The findings and recommendations were executed under date of April 2, 1952, by Lt. Col. A. E. Harrell, Lt. Col. John E. Grant, Maj. William B. Anderson, and Legal Officer Phillip H. Kelley. The board recommended that the plaintiff be held liable for the total cost thereof in the sum of $91,105.41, less any amount recovered through salvage operations, and that all others concerned be relieved from any responsibility. The successor contracting officer, Maj. George W. Loer, concurred in the recommendations of the board as “findings of the contracting officer”.
The report relied for the quality and condition of the components upon certificates of the Government inspectors at the suppliers’ plants, and upon the shipping documents. These documents were attached to the report. They covered 13 carloads and 6 truckloads of crackers and 5 carloads and 4 truckloads of cookies shipped by suppliers during the period May 14 to September 10,1951.
On July 21, 1952, the contracting officer issued findings of fact in respect to the GFP components of cookies and crackers addressed to the plaintiff, wherein it was found that plaintiff was liable for $89,507.08 for the same, computed as follows:
151,293 pounds cookies, with delivery cost oí_$27, 728.17
366,822 pounds crackers, with delivery cost of_ 61, 882.93
89,611.10
Less credit for salvage_ 104.02
Total_ 89, 507. 08
The plaintiff made timely appeal to the Secretary of the Army from the determination of the contracting officer, and *208 the dispute was heard and considered by the Armed Services Board of Contract Appeals in ASBCA No. 1471.
The board issued its decision November 29,1954, in which plaintiff’s appeal was sustained. The decision stated in conclusion:
It is unnecessary to determine, and for the purpose of this decision it may be assumed, that the food did not become infested in the bakeries. We believe that the weight of the evidence adduced before the Board adequately establishes that the infestation originated while the cookies and crackers were in transit to the appellant’s plant in railroad cars. We find also that the appellant took reasonable precaution to keep its plant and its rented warehouse space free from infestation and that its inspection of the cases of food upon receipt was reasonably careful under the circumstances. Since the infestation originated while the property was in transit off its premises, the appellant, under Article 30 (a) of the contract, is not liable for the value of the cookies and crackers.
The defendant contends that the decision of the Board of Contract Appeals is not supported by substantial evidence.
We need not determine whether or not the finding of the Board that the infestation originated while the cookies and crackers were in transit is substantially supported. For the purpose of this counterclaim, the question is whether or not the infestation originated at plaintiff’s premises. To the extent that the Board’s decision found that the infestation did not originate at either plaintiff’s plant or rented warehouses, we find that it was supported by substantial evidence. Likewise, the evidence adduced at the trial de novo here supports that finding.
The defendant also claims for offset the sum of $3,225.75, representing the reduction in plaintiff’s labor costs by the authorized deletion of plastic spoons from the assembly of some 3,225,750 rations, less the sum of $3,000 previously deducted from vouchers rendered by the plaintiff.
During the period November 15,1951, to January 14,1952, the plaintiff assembled 1,391,640 rations with spoons, all of which were shipped to the Alford Refrigerated Warehouse in Dallas, Texas. The remaining 3,225,750 rations were assembled without spoons.
*209 The contracting officer determined that plaintiff’s cost figures indicated a cost of $.001 per ration for packing the plastic spoons, and a reduction of $3,000 was made in one of plaintiff’s vouchers about the end of January 1952. The plaintiff accepted the reduced payment check under protest, and on February 7,1952, requested a speedy adjustment of all claims.
No modification of the contract was agreed upon for the deletion of plastic spoons from some 3,225,750 rations assembled by the plaintiff. A fair and reasonable allowance for credit against the contract price is $.001 per ration or the sum of $3,225.75.
This item of the counterclaim can apply only if the plaintiff does not sustain any part of its claim, as the deletion of the spoons merely reduced plaintiff’s costs by approximately $3,225.75, which reduced its losses by a corresponding sum.
As the last part of its counterclaim, the Government claims that plaintiff either damaged or lost the following items of GFP in excess of the one-half percent tolerance specified in the contract •

¿.mounts claimed

Pears- $23.14
Fruit cocktail_ 3.30
Starch jelly discs- 109.39
Sugar- 449.10
Milk_ 147.26
Crackers_ 427.89
Cookies_ 135. 66
Plastic spoons_ 129. 80
Lids (B-cans)_ 240.29
Laminated foil, kraft, accessory bags_ 175. 71
Totals-1, 841.54
Add 4 percent (per contract)_ 73. 67
Totals_1,915.21
The plaintiff concedes responsibility for the first three items. The defendant’s property officer concedes that items in the foregoing claim originally charged to plaintiff on a weight basis are not properly charges to the plaintiff on a unit basis. These items include sugar, milk, crackers, cookies and B-can lids. No allowance was made for breakage of oversized crackers and other defective components in packing the same.
*210 Sugar, milk and coffee powder came in small packets of about 1,000 per case. B-can lids were skipped to plaintiff in packages of 1,000 to 1,500. Cookies and crackers were packed in cases and marked on a weight basis. None of these items were actually counted in the determination of the shortage. Consequently, we do not see how plaintiff can be held accountable for them.
The plaintiff was charged with 36,200 accessory bags of which 16,525 were unaccounted for, and 19,675 represented bags damaged in processing. The tolerance allowance was 23,087, and plaintiff was held accountable for 13,113 accessory bags having a value of $175.71. Manufacturers’ defects in 177,075 bags were not charged to plaintiff. The plaintiff experienced great difficulty in opening these bags and in the bursting of bags after they were packed. It was not reasonably possible to inspect and set aside all defective bags before attempting to use them, and it is reasonable to conclude that most of the bags damaged in the assembly process were defective and should have been so classified in this accounting. The claim of $175.71 for accessory bags is not a proper charge against plaintiff.
Since plastic spoons were credited to plaintiff in only those rations reported by the plaintiff with no units damaged in processing, the plaintiff is properly charged for the excessive shortage in these units.
The allowable offset against plaintiff for damage to or loss of Government property is the cost of these items, $265.63, plus four percent as specified in the contract, $10.62; a total of $276.25.
We conclude that the compensable damages flowing from the defendant’s breach of contract amount to $193,875.49, broken down as follows:
Storage, switching and other direct costs_$35,955.34
Increased direct labor- 78,458.06
Apportionment of other assembly costs_ 6,. 844. 51
Apportionment of indirect costs:
Main plant- 41,421. 01
Canova Foods, Inc_‘_ 9, 739. 45
Net loss of the rental value of buildings_ 13, 217.74
Loss on sale of waste_ 4,039.38
Fumigation cost_ 4,200. 00
Total_ 193, 875.49
*211 The Government is entitled to recover $276.25 on its third counterclaim, and its first and second counterclaims will be dismissed.
Offsetting the amount found to be due the Government on its counterclaim against the amount of plaintiff’s recovery provides for the entry of the judgment in favor of plaintiff in the sum of $193,599.24.
It is so ordered.
Littleton, Judge {Ret.); Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiff, Oliver-Finnie Company, is a corporation duly incorporated in 1888 under the laws of the State of Tennessee, with its principal office and place of business in Memphis, Tennessee. The company has been continuously engaged in the business of food distribution, the manufacturing of candy, extracts, other food products, and in the processing of coffee, pepper and other spices, and was so engaged in the year 1951.
This is a suit for recovery by the plaintiff of alternate sums of $537,452.76 and $548,344.25, growing out of its performance of a written contract with the defendant through the Office of the Quartermaster General, Department of the Army, for the assembling of combat rations, as more particularly outlined below. The first sum named is based on the claim that certain actions of the defendant constituted a termination of the written contract, so that subsequent performance by the plaintiff was on an implied contract on a quantum meruit basis. The second sum is for alleged damages resulting from defendant’s breach of the written contract, for extra work, and for additional costs incurred at the request and on behalf of the defendant.
The defendant has filed counterclaims of approximately $97,274.46.
2. On February 13, 1951, the Office of the Quartermaster General, Department of the Army, issued Procurement Di *212 rective CG-0311-00-1-07 to the Chicago Quartermaster Depot, Purchasing Division, for the procurement of 38,000,000 individual combat C rations for delivery at the rate of 7,-600,000 monthly from June through October 1951, inclusive. The rations were to be assembled in separate cartons and consisted of 6 assorted menus, numbered 1 through 6, which were to be packed in shipping cases, 6 rations to a case. The cost of a completed ration was originally estimated at $2.40, but this was revised from time to time, and the final estimate was $2,033 per ration.
3. A request for proposals was issued March 7, 1951, by the Chicago Quartermaster Depot, Purchasing Division, for the final assembly and sub-assemblies of components to be furnished by the Government for the combat C rations. The request for proposals provided that individual bids would not be considered for less than or in excess of 4,420,000 rations, each, and that the quotations should include both the final assembly and the sub-assemblies of B-l, B-2 and B-3 units, accessory packet and plastic spoons.
The request for proposal contained substantially all of the provisions which were later incorporated into the contract, including the proposed schedule of shipments of components and shipping materials to be furnished by the Government and the schedule of deliveries of assembled rations packed for export in accordance with the Quartermaster Corps purchase description dated August 9, 1950, and changes No. 4, dated February 13, 1951. It also provided that a detailed cost breakdown would be submitted if required by the contracting officer.
4. The plaintiff submitted its bid March 21, 1951, for the final assembly and sub-assemblies of 4,420,000 combat C rations at $.07865 each, amounting to $347,633.
Upon a telegraphic request of the contracting officer, dated April 3, 1951, the plaintiff replied the same day and submitted its estimated and tentative figures of its cost breakdown per unit as follows:
Materials_$. 0083
Direct labor_ . 04525
Factory expense_ . 00835
General and administrative expense- . 00675
Profit_ .01
*213 5. On March 27, 1951, a pre-award survey of plaintiff’s facilities was performed by the Quartermaster Inspection Department. This survey disclosed that the plaintiff had no previous experience with respect to the assembly of rations but that other Government supply contracts had been completed by it on schedule. The report of survey stated in part:
Contractor has not as yet done much planning on this contract and will start setting up only after award is made. He will arrange to buy or rent additional machinery and equipment as necessary. In my opinion conti’actor cannot deliver 20% of invitation quantity before 30 June and I will recommend that this bidder be given an award only if the following delivery schedule is acceptable:

Percent

30 June_ 10
30 July- 20
30 August- 30
30 September_ 20
30 October_ 20
On April 4, 1951, the contracting officer sent the plaintiff telegraphic advice of the award of a contract in accordance with the request for proposal dated March 7, and plaintiff’s bid of March 21, 1951, for the assembly and sub-assemblies of 4,420,000 rations at a unit price of $.07865.
6. Contract No. DA-11-009 QM-9128, dated April 26, 1951, was entered into as of April 4,1951, between the plaintiff and the Chicago Quartermaster Depot, U.S. Army Quartermaster Purchasing Division, by Captain Randolph B. Capper as contracting officer. The contract provided that plaintiff perform the final assembly and two subassembly operations for 4,420,000 complete rations at the unit price of $.07865, or a total of $347,633. The bid price was based upon the contractor’s employees working not in excess of one 8-hour shift a day, 5 days a week, to fulfill the delivery schedule.
The delivery schedule provided for the delivery of 884,000, or 20 percent of the completed rations, on or before June 30, 1951, and 20 percent monthly thereafter, to and including October 1951. Shipment was to be on Government bill of lading to be furnished to plaintiff. The plaintiff was required to furnish all adhesive, gummed tape, *214 strapping materials and the necessary equipment for the completion of rations in accordance with Quartermaster Corps purchase description dated August 9,1950, and changes No. '4, dated February 13, 1951. Acceleration of shipments was authorized at no additional cost to the Government.
A variation not in excess of 5 percent of the contract quantity was acceptable under the contract. The contractor was required to issue a telegraphic notice of each shipment to the consignee establishment and to the Chicago Quartermaster Depot for the attention of the Purchasing Division.
7. The contract listed in detail the components and packaging materials that would be furnished by the Government at 5 percent in excess of contract requirements, sometimes designated as GFP (Government-furnished property).
The components consisted of 38 items, including 18 items of canned fruit, jam, and meat, and 20 other food items, all specified in quantities at 5 percent in excess of contract requirements.
The packaging materials consisted of 13,923,000 empty cans and lids for sealing the same — 13,923,000 liners and 46,410,000 pads for the sub-assembly of B-l, B-2, and B-3 units in cans. It also included 4,641,000 laminated foil kraft bags for the sub-assembly of the accessory packet, 4,641,000 cartons for the final assembly of the individual rations and 773,500 boxes, with a like number of sleeves, for packing the rations, numbers 1 to 6 in each case, for final shipment.
The Government-furnished property was scheduled for delivery to the contractor’s plant at 12% percent on or before May 20, 1951 and 12% percent semimonthly thereafter until September 5,1951.
The contractor was to be responsible for any loss or damage to GFP in excess of %0 of 1 percent of food components and % of 1 percent of packaging materials. Any excess loss was to be paid for by the contractor at the prevailing Government price, plus 4 percent thereof. The contractor was required to retain and store all damaged property at no cost to the Government until such time as the contracting officer issued instructions for its disposition.
*215 8. In connection with, the delivery schedule of GFP the contract provides:
However, the contractor warrants and agrees that it has available sufficient storage space for the storage of the entire quantity of the Government-Furnished Property (including packaging materials) and will, if required, store and handle the entire quantity of said Government-Furnished Property at no cost to the Government irrespective of this Schedule, during the entire life of the contract and for an additional ninety (90) days thereafter. The contractor shall not be entitled to any adjustment in price in accordance with paragraph (c), of General Provision 85, “Liability of The Government On Account Of Its Undertaking To Furnish Components”, except to the extent that the contractor may be required to store and handle Government Furnished Property in excess of a period of Ninety (90) days after the final delivery date for the completed rations, and then only to the extent of storage and handling charges actually incurred.
The contract provided that title to all containers in which GFP was delivered would vest in the contractor as a part of the consideration for the services to be performed.
9. The contract further provided that the contractor would be responsible for the inspection of all GFP arriving at its plant, for condition and count, and for promptly annotating bills of lading and vendor’s shipping documents as to any shortage or damage after notice to and verification thereof by a Government inspector. It further stated:
The contractor will, at its own expense, furnish the labor for such inspection including a 100% inspection if considered necessary by the contracting officer.
The Government inspection of plaintiff’s performance of the contract was to be arranged for by the Chicago Quartermaster Depot Inspection Division, and the costs incident thereto were assumed by the Government.
10. The general provisions of the contract provided in part:
2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or *216 more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specifically manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt of the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
3. EXTRAS
Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer.
5. INSPECTION
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
12. disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such ap *217 peals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
3 5. LIABILITY OP THE GOVERNMENT ON ACCOUNT OP ITS UNDERTAKING TO PURNISH COMPONENTS
(a) The Government will use its best efforts to cause components herein provided to be furnished by the Government, to be delivered to the contractor at the time or times herein specified but the Government cannot and does not guarantee that components will be so delivered.
(b) Any failure by the Government to cause components to be delivered as herein provided shall not be considered as a breach of contract on the part of the Government and the contractor shall not be entitled to receive damages by reason thereof, it being expressly understood and agreed that the right of the contractor to an extension of time for performance and a price adjustment as hereinafter provided in this article shall be in lieu of any remedy which might otherwise be available to the contractor.
(c) In the event of a failure of the contractor to receive components at the times specified in this contract which shall result in the inability of the contractor to make deliveries in accordance with the contract schedule for delivery of assembled food packets, the time for making such deliveries will be extended for such period or periods of time as may reasonably be necessary to enable the contractor to make deliveries after the receipt of components and the contract price will be adjusted to include any actual costs of performance which would not have been incurred except for such failure to receive components on time. Under no circumstances shall any price adjustment under this paragraph include compensation for loss of profit or any other element of damages other than actual increased costs of performance over the extended term of the contract to the extent that such costs would not have been incurred had components been received on time. Such adjustment will not include costs resulting from delays in performance which would have been experi *218 enced without regard to delays in receiving components even though components are not received on time, and such costs shall not include the cost of storing and handling Government furnished components except to the extent that the total quantity of such components required to be carried exceeds the maximum quantity which the contractor would have on hand at any time under the contract, if all components had been delivered to the contractor at the time or times specified in this contract and if performance upon the part of the contractor had also been in accordance with the contract, and then only to the extent of storage and handling charges actually incurred. No adjustment in price shall include the cost of storing and handling any components or supplies to be furnished by the contractor.
(d) The contractor shall be entitled to the extension of time for performance and the adjustment in price authorized by Paragraph (c) of this Article only upon written demand to the Contracting Officer within 10 days after the receipt of all components to be furnished by the Government or advice from the contracting officer that no further components will be delivered. Such demand will be accompanied by a detailed statement as to costs and will thereafter be supplemented by such other information or data as the contracting officer may require. The contracting officer or Iris representatives shall have access to any and all of the books and records of the contractor for the purpose of verifying costs and determining the propriety of the extensions and amount of price adjustment to which the contractor may be entitled under this Article. If the parties are unable to agree upon such extension or price adjustment the resultant dispute will be settled pursuant to Provision 12 of this contract entitled “Disputes”. Any extension in time for performance or price adjustment agreed upon or otherwise determined shall be evidenced by a supplemental agreement to this contract.
(e) In the event that total quantity of Government furnished components received by the contractor capable of being used in the assembly of rations under this contract shall be fewer than specified in the contract and the contracting officer advises the contractor that no further components will be furnished, the contractor will deliver at the unit price specified in the contract as many food packets as can be assembled therefrom and the balance of the contract will be cancelled without cost to either party, provided that components for the assembly of at least 95% of the total number of food *219 packets to be assembled hereunder shall have been delivered. Any components remaining on hand after the assembly of all food packets will be packed and returned to the Government within 30 days. The cost of storage, handling and loading such components will be borne by the contractor. Shipment will be made on Government Bills of Lading to be furnished by the Government at the Government’s expense. The price adjustment authorized by Paragraph (c) of this Article will not include any element of cost resulting from any under or overshipment of Govermnent furnished components or for costs incident to handling such components, including the handling of components which for any reason cannot be used in the contractor’s assembly operations, reimbursement for such costs being expressly waived by the contractor.
Change Order No. 1 was issued December 6,1951, and reduced the contract price by $50 to $347,583, because of punctured and dented cans involving some 15,504 completed rations. The change order was signed by Captain Martin Baker as contracting officer, and states “the contractor agrees to said reduction in price”.
11. The Purchasing Division of the Chicago Quartermaster Depot at about the same time entered into similar contracts with some six other firms for the assembly of combat C rations under PD-0311, three of which firms were then engaged in the performance of similar assembly contracts under a prior purchase directive. The Quartermaster Depot at Chicago also conducted its own assembly of combat C rations under prior purchase directives and actually assembled approximately 6,600,000 of the 38,000,000 required under PD-0311.
12. The components and packaging materials were supplied through independent contracts with numerous firms.
13. The plaintiff’s work consisted of two sub-assembly operations, the final assembly of the complete ration, and the packing of six rations in each shipping case. Each ration represented a day’s menu for a soldier on combat duty, and the case of six assorted rations supplied a squad of six.
14. One sub-assembly consisted of packing a waterproof laminated foil-lined kraft accessory bag with sugar, milk. coffee, cigarettes, chewing gum, and other small components. *220 This assembly was performed by Canova Foods, Inc., of Memphis, a wholly owned subsidiary of plaintiff. The other sub-assembly consisted of packing certain specified components into hermetically sealed tin cans known as B-units, including jam, sugar, coffee, milk, cookies and crackers, with variations of components in the three types of cans designated as B-l, B-2 and B-3 units. The assembly of the B-units was performed by the plaintiff in its main plant in three separate assembly lines, so arranged that they led directly into the main assembly line without rehandling.
The empty cans and lids for the B-units comprised 93 carloads out of a total of approximately 640 carloads of components and packaging materials.
15. The final assembly involved the packing of three different canned-meat components, one canned-fruit component, one each of the B-l, B-2 and B-3 units, and the accessory bag into a folding carton for a single C-ration. Six rations, each containing a different combination of meats and fruits, and a bar of soap, were then packed into a corrugated shipping case, which was fitted with a corrugated sleeve. The flaps were first glued and then bound with two flat steel straps. The sub-assembly of the B-units and the final assembly were performed along conveyor belts that carried the packed cases to the loading out area.
16. Upon notification that its bid had been accepted, the plaintiff undertook to provide additional equipment and facilities to perform the contract. William C. Carson, a graduate mechanical engineer and a vice president and director of the plaintiff corporation, designed the assembly lines and determined the equipment necessary to perform the contract according to the delivery schedule in the contract and specifications. He made a study of two publications designed to assist ration assemblers, which had been provided through the Quartermaster, and discussed the operational requirements with plaintiff’s president and Charles W. McConnell, who had inspected the assembly operations at the Quartermaster Depot in Chicago, prepared plaintiff’s bid, and thereafter supervised the assembly operations under the contract.
*221 The equipment and assembly lines were designed and provided to fulfill the contract delivery schedule, plus a margin of 20 percent of additional capacity. The defendant’s area supervisor for plant inspection considered the plaintiff’s overall facilities a suitable set-up for the performance of its contract.
17. The delivery of components began to arrive at plaintiff’s plant by the end of April 1951. By June 5, 1951, almost one-third of all components required for assembly under plaintiff’s contract had been shipped by suppliers under contracts with the Chicago Depot Quartermaster’s Purchasing Division.
None of the canned fruit components that were specified in the contract had been shipped by June 5, but 5 carloads of applesauce and 3 carloads of grapefruit had been received by June 6, which were later substituted for other fruit components. No substitutions could be made by the assembly contractor until written authorization had been received from the contracting officer. Authorization to substitute was always given by the contracting officer.
Substantial shipments had been made by June 5, 1951, for 10 of 11 items of canned meat components specified in the contract. The only meat component for which no shipment had been made was the item of hamburgers and gravy, which item was supplied later, largely under contracts by the Lake Odessa Canning Company of Michigan and Dorset Foods, Ltd. of Long Island City, New York. The first shipment of hamburgers was made July 16, and was not received until July 25, 1951. However, by June 5, 1951 about 38 percent of the overall meat components had been shipped by other suppliers.
18. On June 2, 1951, Colonel Durbin of the Office of the Quartermaster Corps in Washington sent a telegram to the Chicago Quartermaster Depot, which reads:
Confirming instructions given this date to Colonel' Hirschhorn and Captain Brines. Due to difficulties in procurement of canned meats and the inability of this office to effect an immediate solution for the supply thereof, it is desired that you take immediate action to reset the. assembly program for operational rations so as to begin on or about 16 July. The date to b.e variable *222 as found best suited to the supply of components. If adequate arrangements can be concluded in the near future for the supply of operational meats you will be advised accordingly. Colonel Hirschhorn has been furnished with data regarding supply position of the QMC with regard to operational rations. Purpose of furnishing this data is to assure you that at present ample supplies are on hand to meet commitments for the immediate future. General Feldman and Colonel Hollis have approved the above plan.
Pursuant to the above instructions the contracting officer, on June 5, 1951, sent the plaintiff the following telegram, sometimes referred to hereinafter as the “stop order”:
Request that no action be taken to begin final assembly until further notice. Sub-assemblies can be started when you desire.
19. On June 15,1951, the contracting officer advised plaintiff that the tentative earliest starting date for final assembly of individual combat C rations would be July 16. On July 9, 1951, the plaintiff received the following telegram:
Authority issued to start assembly of ration, individual combat C in accordance with contract on 16 July. Substitution of components when required must be authorized before substitution is made. Contact Major Lauer of this Depot for substitutions.
The plaintiff received no explanation for the stop order during the performance of the work under its assembly contract, but under a proposed change order No. 1, dated September 4, 1951, the contracting officer advised plaintiff of the extension of deliveries 56 days from October 31 to December 16, 1951, “for the convenience of the Government.”
On June 15, 1951, Colonel Hirschhorn approved the commencement of final assembly of the C rations by Flotill Products, Inc., Boothe Fruit Company, Rosenberg Brothers and the Chicago Quartermaster Depot, but directed that all other .assemblers be delayed until July 15, 1951.
20. There was, in fact, no shortage of slaughter cattle during the period of plaintiff’s contract. The Army did not procure any of the meat for canners who were supplying the canned meat components for plaintiff’s contract.
*223 The situation described in the telegram of June 2, 1951, to the Quartermaster Depot in Chicago had prevailed since January 1951, and was particularly apparent by February and March 1951, before the award of plaintiff’s assembly contract.
The Office of Price Stabilization (OPS) had established a freeze of prices for each establishment engaged in meat production in December 1950, and about April 1951 established ceiling prices in all categories. The packers, and the boners with whom canning contractors had placed orders for their meat supply, were under a price squeeze between the cost of livestock and the OPS ceiling prices. While cattle was available for slaughter, little was made available for market because of the price situation.
21. The slaughter of Federal inspected cattle during the early months of 1951, represented an overall reduction to approximately 87 percent of the production for the corresponding period of 1950. The comparison for February 1951 was 73 percent of slaughter for the same month in 1950; for March 1951, 89 percent; for April 1951, 93 percent, and for May 1951,92 percent.
The Army was primarily and directly concerned with the procurement of fresh meat of a grade not lower than “choice” for A rations which were perishable. Canned meats were nonperishable, and were known as B rations, but the A rations were used to the greatest extent possible up to the front lines.
22. On May 18, 1951, Col. Lloyd E. Hirschhorn, Chief, Operational Rations Branch, Chicago Quartermaster Depot, wrote the plaintiff, in part:
At this time accelerated delivery of ration components is not contemplated. Insofar as possible component suppliers will forward to your plant the periodic quantities specified in their contracts and noted in yours.
I am bringing this to your attention so that your production planning may be timed accordingly without unnecessary cost to you, and to insure the orderly assembly and scheduled delivery of operational rations in the interest of the Government.
Every effort will be made to keep you informed of any contemplated changes which may affect your con *224 tract. It is requested that you also advise this office of such matters. It is our intention to offer you the greatest possible assistance at all times.
23. Disregarding as irrelevant the difficulties of the Army in the procurement of fresh meat for A rations under the OPS regulations, the real reason for the decision to hold up the assembly of C rations under Procurement Directive of February 13, 1951, was obviously and primarily the fact that the pipelines were full. As reported by Colonel Hirschhom on June 4, 1951, rations on hand were adequate.
The stock on hand of C rations as of May 25, 1951, was 12,488,686. To this should be added the production of the period May 1A-29 en route to depots to the amount of 6,-743,720 rations. An estimated further production to July 13 of 4,460,000 C rations would bring the total to 23,692,406. With a contemplated production of 7,600,000 per month by the eight assemblers while in production, a delay until July 16 would help solve problems of handling and storage for the defendant.
24. By November 5, 1951, a substantial portion of the C rations was diverted to commercial storage. On that date Colonel Hirschhorn, chief of the operational rations branch, directed the plaintiff to ship all remaining assembled rations to the Alford Befrigerated Warehouse in Dallas, Texas. By telegram of November 27,1951, the Chicago Quartermaster Depot inquired of each assembler whether it could store the rations produced during the assembly period, and for 6 months thereafter, and the estimated costs thereof to the Government. The plaintiff provided no storage for the completed rations.
25. During the period of the stop order from June 5 to July 16, 1951, the plaintiff continued to receive and store GFP. Commencing in June 1951, the plaintiff stored a substantial portion of this property in some five commercial warehouses in Memphis.
26. The sub-assembly of the accessory bags had been commenced by Canova Foods, Inc. May 29, 1951, and this work was continued throughout the period of the delay for final assembly of rations.
27. The sub-assembly of the B-units in plaintiff’s main plant was commenced about June 22,1951. The substitution *225 of any components in any of the rations numbered 1 to 6, or in any of the sub-assemblies of B-units 1 to 3, or the use of any defective components or materials, required the prior approval of the contracting officer.
28. On June 21 the plaintiff was authorized to use accessory bags supplied as GFP without the packer’s name printed on the same. Upon request of plaintiff the contracting officer on June 26, 1951, authorized the use of plain sweet enriched chocolate discs, in lieu of the same with almonds, for assembly in the B-units; also the use of can lids which were supplied without the packer’s name on the same, but with the request that the packer’s name be abbreviated in code for identification.
On July 10, 1951, the plaintiff requested authority to substitute other meat items for hamburger patties, and grapefruit, pineapple, and applesauce for other fruit items that had not been furnished. These substitutions were approved for specific rations 1 to 6, on July 13. Thereafter numerous substitutions were authorized during the performance of the contract.
29. Had substitutions been authorized for the subassem-bly of the B-units, and the final assembly of rations, the plaintiff could have commenced the assembly of the completed rations early in June 1951.
30. The sub-assembly of the accessory bag at the Canova Food Company plant from the end of May 1951, and the sub-assembly of B-units in plaintiff’s main plant, commencing June 22,1951, required the storage and proper care of these completed sub-assemblies until plaintiff was authorized to commence the final assembly of rations on July 16, 1951.
The increased cost of this delay is not separately determinable.
31. On July 10, 1951, the plaintiff wrote the contracting officer giving notice of a claim for adjustment under article 2, Changes, of its contract, and advising that such claim would be submitted as soon as costs were ascertainable.
When the plaintiff submitted its first voucher for completed rations, July 23,1951, the plaintiff wrote the contracting officer that the unit price of $.07865 claimed therein, as *226 well as all subsequent invoices rendered at this rate, would be subject to final adjustment under modifications to the contract and changes in the specifications.
Both the notice of claim and the statement reserving final adjustment in vouchers rendered, were acknowledged by the contracting officer.
32. On September 4,1951, the contracting officer forwarded to plaintiff Change Order No. 1, reading in part:
2. For the convenience of the. Government, it is desired to delay assembly of rations covered by subject contract, and therefore the original schedule of deliveries appearing on page No. 2 of said contract is hereby deleted, and the following substituted in lieu thereof:
The revised schedule of deliveries provided for the delivery of 884,000 rations by August 16, and the same quantity thereafter each month to December 16, 1951, without any change in the compensation specified under the contract. The proposed change order No. 1 was not accepted by the plaintiff.
33. On October 11, 1951, the plaintiff wrote the contracting officer proposing an extension of time of 56 days for the delay in commencing the assembly of rations, with a revision of the delivery schedule to provide deliveries of 884,000 rations on or before August 27, and a like number monthly thereafter, with final delivery by December 27, 1951. This letter also proposed that formal modifications of the contract be issued in chronological order for numerous change orders, variations and substitutions since the contract was started. Some 16 items of changes in assembly, substitutions and screening of defective components and packaging containers were listed for modifications of the contract.
By letter of October 31, 1951, the contracting officer advised plaintiff that the delay period covered the month of June, and 16 days in July, and that the period of 46 days’ delay would extend the final delivery to December 16, 1951. This letter also stated:
With reference to your request for formal modification to cover variations and substitutions made during the course of this contract, please be advised that we regard these changes as operational changes, and as they *227 do not reflect a basic change to the contract itself, no modification to the contract is contemplated.
34. No change order was thereafter issued for the stop order of June 5, 1951, nor for any of the changes in the contract authorized or directed by the contracting officer theretofore or thereafter. The substitution of one component for another was considered an operational change by the contracting officer, and no change orders were issued to cover such substitutions.
35. The contract assembly period for the completed rations was June through October, 1951. This period covered 107 working days under the 5-day week specified in the contract, exclusive of holidays. This exact number of working days for the final assembly is also included in the extended period authorized by the contracting officer’, following the stop order, from July 16 to December 15,1951. The average rate of production for the assembly of 4,420,000 rations would be 41,300 for each work day.
The plaintiff’s actual performance of final assembly covered the period from July 16, 1951 to January 19, 1952, or 130 work days, exclusive of holidays. The plaintiff completed and shipped approximately 330 carloads, representing 4,617,390 rations or about 35,500 as a daily average. The deficiency in performance, of approximately 14 percent in the average daily production, resulted substantially from the slowdown in the assembly operation by reason of excessive defects in the components and packaging materials furnished by the Government.
The plaintiff was paid $360,081.24 for rations assembled and delivered at the original contract rate of $.07865 per unit, less $3,000 for the deletion of plastic spoons from a large number of rations, as hereinafter reported, and for other minor adjustments.

Plastic Spoons

36. The plaintiff’s contract specified 13,923,000 plastic spoons for the assembly of three spoons in each completed ration. On April 30, 1951, the contracting officer advised the plaintiff that plastic spoons would be deleted from its assembly contract at an appropriate price reduction and *228 requested a proposal for tbe price reduction by May 14, so that a modification of the contract could be made before the assembly commenced on June 1, 1951. The plaintiff failed to submit a proposal, as requested, but on June 9 advised the contracting officer that any saving would be difficult of determination, and requested information as to the weight and volume of the spoons, for consideration in connection with their storage and handling.
On September 14, 1951, the contracting officer advised plaintiff that plastic spoons would be packed according to specifications, commencing about October 26, with the 3,100,000th ration, and that rations so assembled would be marked as containing spoons. Thereafter, during November 1951, the plaintiff received 4,198,500 plastic spoons. The plaintiff was advised on December 19 that when the spoon supply became exhausted this item would be eliminated from the balance of the contract.
37. During the period November 15, 1951, to January 14, 1952, the plaintiff assembled 1,391,640 rations with spoons, all of which were shipped to the Alford Refrigerated Warehouse in Dallas, Texas. The remaining 3,225,750 rations were assembled without spoons.
The contracting officer determined that plaintiff’s cost figures indicated a cost of $.001 per ration for packing the plastic spoons, and a reduction of $3,000 was made in one of plaintiff’s vouchers about the end of January 1952. The plaintiff accepted the reduced payment check under protest, and on February 7,1952, requested a speedy adjustment of all claims.
No modification of the contract was agreed upon for the deletion of plastic spoons from some 3,225,750 rations assembled by the plaintiff. A fair and reasonable allowance for credit against the contract price is $.001 per ration or the sum of $3,225.75.

Oversized Crachers

38. As soon as the plaintiff began the sub-assembly of the B-units, it experienced difficulty in packing the crackers, because they were oversize. On June 29, 1951, plaintiff complained to the chief inspector, and requested the size called for in the Government specifications. On July 5, *229 1951, Chief Inspector Thomas B. Kennedy wrote the Chicago Quartermaster Depot that some three cars of crackers from Carr-Consolidated Biscuit Company were found to be from %-inch to %-inch above specification; that plaintiff was having difficulty in packing these crackers in the B-unit cans, and that crackers were being broken in this operation. He authorized plaintiff to switch over to crackers from Sunshine Biscuit Company which were said to meet specifications. The same difficulty was experienced in packing crackers from the Sunshine Biscuit Company.
39. On July 2T, 1951, the contracting officer determined that these oversized crackers were the property of the United States, since they had been inspected and accepted at the manufacturer’s plant, and that they must be used in the assembly, and so notified plaintiff.
On July 25, 1951, the chief inspector of the Processed Foods Section wrote the chief inspector at plaintiff’s plant that oversized crackers were to be used in the assembly, and that any resulting breakage in the B-units was to be accepted in accordance with the memorandum of the contracting officer, and that the supply of these crackers was to be exhausted as soon as possible. This letter stated in part:
3. Every effort must be made to see that we get as good a pack as possible under the circumstances; but it is also important that the Oliver-Finnie Company does not suffer excessive labor costs due to the use of this non-specification GFP. It is not to be indicated to the Oliver-Finnie Company by QM Inspection Personnel that the Government might in any way be liable for a consequent slowdown in production.
40. On August 9,1951, the plaintiff wrote the contracting officer that, upon a telephone request by Major Lauer, a test run was made for a full day on August 3, which revealed a drop in production of 25 percent, indicating an increase in direct costs of 33 percent. Plaintiff suggested that the oversized crackers be either replaced, with indemnification for expenses incurred, or that a satisfactory salvage contract be negotiated with greater tolerance for breakage, and that the price for performing such a salvage contract should be one cent per can for the oversized crackers packed.
*230 41. On August 15,1951, the contracting officer wrote plaintiff directing it to delete the glassine liner from the B-unit cans in order to expedite assembly for the packing of the eight carloads of oversized crackers from Carr-Consolidated Biscuit Company which the chief inspector had previously determined to be of non-specification size, and that these crackers be placed in assembly and utilized completely before using any other crackers. Plaintiff was directed to pack these crackers sufficiently tight to preclude any vertical motion of the contents within the sealed can.
42. Thereafter the chief inspector found an additional carload of oversized crackers from Carr-Consolidated Biscuit Company and eleven carloads of oversized crackers which had been supplied by the Sunshine Biscuit Company. The contracting officer also authorized the deletion of liners from B-cans for all of these oversized crackers. The total quantity of these oversized crackers involved 573,430 pounds, or 'approximately 46 percent of the plaintiff’s total contract requirements.
43. All oversized crackers were utilized and packed by October 25, 1951. After plaintiff was authorized to delete the liners from the B-unit cans during the period August 17 to October 25, 1951, the plaintiff packed 5,593,577 B-unit cans of all three types with oversized crackers, representing an average daily production of 111,871 or approximately 89 percent of its contract scheduled rate of assembly.
In packing these oversized crackers without the can liners the Government furnished, and plaintiff utilized approximately 6,700,000 additional pads to secure the components assembled in these B-units.
The plaintiff suffered some delay and an indeterminable amount of increased costs in assembling oversized crackers furnished by the Government.

Infestation of Oooldes and OracT&ers

44. The infestation of cookies was first discovered and reported by plaintiff’s employees on the assembly line for B-units about October 5, 1951. The infestation consisted primarily of the presence of an insect known as the sawtooth beetle or grain beetle. The infestation of crackers *231 was first discovered on the assembly line abont November 9, 1951. Immediately upon tbe discovery of infested cases of these bakery goods the entire lots being assembled were withdrawn, and thereafter a thorough inspection was made of each lot before it was brought to the assembly line.
45. By September 10, 1951, the entire contract requirements of cookies and crackers had been shipped to the plaintiff by suppliers. By October 5,1951, when infested cookies were first discovered, the plaintiff had completed 1,952,119 rations or approximately 42 percent of the total number ultimately assembled.
46. Butterscotch sandwich cookies were supplied by Mego-wen-Educator Food Company, the Weston Biscuit Company and the Carr-Consolidated Biscuit Company under supply contracts with the Government. By September 10, 1951, these suppliers had shipped 488,551 pounds of cookies. The contract specified 9,282,000 cookies or approximately 464,100 pounds.
47. From May 15 to August 16,1951, the Sunshine Biscuit Company had shipped 888,032 pounds of crackers and the Carr-Consolidated Biscuit Company had shipped 352,710 pounds from May 14 to September 10, 1951. These shipments of 1,240,742 pounds exceeded the contract requirements which specified 55,692,000 crackers or approximately 1,224,000 pounds.
48. Following the discovery of infestation in these bakery products, the plaintiff inspected all cookies and crackers remaining in storage, under the supervision of Government inspectors. The inspection was conducted on the fourth floor of plaintiff’s building. The examination was performed by lots, sample cases being selected at random from the various lots of stored cookie and cracker components and a 100 percent inspection was made of the selected cases. The operation required the opening of each case and the emptying of the contents thereof upon an inspection table, the examination of the contents and cases, and their repacking.
As a result of this inspection the Depot Veterinary Inspector condemned as unfit for use approximately 366,822 pounds of crackers and 151,293 pounds of cookies, and the *232 plaintiff was furnished “turn-in” slips for its accountability for these items of GFP. Except for approximately 5,175 pounds that were sold locally by the Memphis General Depot as not fit for human consumption, these crackers and cookies were donated and shipped to the Federal Penitentiary at Atlanta during November and December 1951.
49. The cookies and crackers that were condemned as unfit for use were largely replaced by additional shipments of 360,315 pounds of crackers and 35,517 pounds of cookies from Carr-Consolidated Biscuit Company during November and December 1951.
Flotill Products, Inc., which had completed its assembly contract by the end of October 1951, transferred and shipped to plaintiff 97,351 pounds of GFP cookies in two carloads as replacement components. Both of these carloads of cookies were inspected upon arrival at plaintiff’s plant and were found infested with beetles.
50. On November 21,1951, plaintiff wired the contracting officer:
Car SP 83037 from Flotill Products Stockton, California on Government B/L now on track. Again the Government has shipped this company infested and damaged cookies. This company can accept no responsibility for such cookies or for any damages or other claims arising therewith and again puts the Government on notice of this fact. This company will hold the Government liable for all additional costs incurred in the handling of these and other components by reason of their failure to meet contract specifications.
Upon confirmation of the infestation in car SP 83037 the contracting officer wired plaintiff on November 23,1951:
You are instructed to reject back to carrier car SP 83037 from Flotill Products, Stockton, California because of evidence of infestation. You are not repeat not to unload this car.
This car was reshipped to Atlanta, Georgia and consigned to the Transportation Officer of the Atlanta General Depot.
The contracting officer also authorized the GFP representative at plaintiff’s plant to release car ATSF 137427 containing infested cookies shipped from Flotill Products, Inc. to the Salvage Disposal Officer at the Memphis General *233 Depot. The GFP representative executed a turn-in slip for the plaintiff November 30, 1951, and this car was also shipped to Atlanta for the Federal Penitentiary.
51. The plaintiff received also three carloads of additional cookies during November and December 1951, transferred from the Chicago Quartermaster Depot. Portions of these cookies were also found to be filthy and infested upon arrival, and 18,157 pounds, or approximately one-half of a carload, were rejected as unfit for use in assembly.
The rejected cookies were from Car MILW 21792 that was shipped from the Chicago depot November 6, and was received at the plaintiff’s plant November 12,1951.
The last carload of cookies shipped from the Chicago depot was received at plaintiff’s plant December 28, 1951. This car N & W 48947 contained 1,334 cartons of 32,016 pounds of cookies, and was inspected 100 percent by lots. On January 7, 1952, Major Quigley, the Veterinary Inspector, wired the contracting officer as follows:
Reference 1197 cases cookies received at Oliver Finnie NW 48947, one hundred percent inspection of 137 cases of Weston cookies packed in March 1951 showed one dead beetle, one live beetle and one larvae. Fragment inspection of 88 cases of Carr cookies packed in May and June 1951 representing remainder of shipment showed one dead beetle and this constitutes a very slight infestation. Recommend these cookies be assembled in ration using Carr-Consolidated cookies first and if necessary to complete contract use remaining Weston cookies.
The contracting officer authorized the use of these cookies in the manner recommended.
52. The 115,508 pounds of cookies rejected upon arrival from these replacement shipments are in addition to the 151,293 pounds which were rejected upon inspection of cookies in plaintiff’s storage from shipments made prior to September 11,1951.
53. The lot of cookies being assembled when beetles were first discovered in the B-unit sub-assembly line was taken from plaintiff’s first basement storage, being part of a shipment received July 30, 1951, in car LS & BC 1111 from the Carr-Consolidated Biscuit Company of Chicago. When *234 this car was first received the receiving clerk found and reported some 351 damaged cases containing 8,424 pounds of cookies out of a total of 25,901 pounds shipped in this car. After a survey of these damaged goods 270 cases were finally accepted for storage and 81 cases of 1,511 pounds were turned back to the carrier. The plaintiff’s record of the cost of survey of the damaged cases in this car is entered on its receiving sheet at $269.71.
54. Following the discovery of infestation of cookies the plaintiff inspected each lot of cookies that were thereafter taken to the assembly line, and provided facilities and employees for the inspection of all cookies then in storage.
The inventory of cookies as of October 19,1951, from shipments prior to September 11, 1951, consisted of 143,157 pounds stored in plaintiff’s main building, 92,226 pounds stored in rented space in the Mayer warehouse, and approximately 2,898 pounds of broken cookies at the sub-assembly lines. These cookies represented substantial portions of 9 carloads received. The cookies remaining in storage in plaintiff’s main building represented portions of shipments from each of the suppliers as follows:

Pounds

Carr-Consolidated Biscuit Company_ 42,000
Weston Biscuit Company_71, 841
Megowen-Educator Pood Company_29, 316
55. The inspection of cookies in storage was conducted under the supervision of Maj. Joseph S. Quigley, the Memphis Depot Veterinarian, who issued his report of inspection October 22, 1951. This report showed that sample cases of all lots stored in the plaintiff’s building showed the presence of alive or dead beetles, and recommended that all cookies in plaintiff’s building be rejected as unfit for packing in the ration for human consumption. Sample cases of cookies stored in the Mayer warehouse showed no evidence of infestation, and it was recommended that they be transferred to the assembly in the main building daily as needed.
Only 143,157 pounds of cookies remained in the plaintiff’s main building storage, but additional lots were later discovered to be infested and a total of 151,293 pounds were finally rejected.
*235 56. On October 30, 1951, a board was appointed to investigate and determine the facts involving the insect infestation of the cookies stored in the Oliver-Finnie Company assembly plant. This board consisted of one officer, Maj. William O. Bradley, who arrived at plaintiff’s plant about November 8,1951. His investigation was concluded December 11,1951, and he found that the infested cookies consisted of 6,567 cases with a total weight of 143,157 pounds which were unfit for ration assembly. This report concluded: “Based upon the evidence presently available, the board is unable to fix responsibility for the insect infestation.”
57. In the interim, on November 9,1951, similar beetle infestation was discovered in crackers being packed in the B-unit sub-assembly.
A similar inspection procedure was performed under the supervision of Major Quigley, the Depot Veterinarian, and on January 11,1952, Major Quigley issued his report to the contracting officer. This report revealed that infestation of crackers was found in all areas where crackers were stored in plaintiff’s main building, the Ballard building, and in the Mayer warehouse. Major Quigley reported, in part:
Based on the above inspections, a recommendation was made that all infested crackers be rejected as unfit for assembly in the ration and unfit for human consumption. This was done and the crackers were disposed of by the Salvage Officer, Memphis General Depot, Memphis, Tennessee.
Turn-in slips had been certified to by the GFP representative for 151,293 pounds of infested cookies and 366,822 pounds of infested crackers during November and December 1951. These items had been disposed of by shipment to the Federal Penitentiary at Atlanta, Georgia.
58. On November 19, 1951, the contracting officer wrote the chief fiscal officer, in part:
It is requested that the following amounts be withheld against above mentioned contractors as follows:
Oliver-Finnie Company_$70, 000
The Hills Bros. Co_ 85, 000
Van Brode Milling Co_210,000
Pacific Grape Products Co- 200, 000
*236 The Hills Brothers Company was also an assembler of the C rations, but the last two firms listed above were assemblers of the 5 in 1 rations.
Plaintiff protested the withholding of its payments on current vouchers, and on November 30,1951, the contracting officer advised plaintiff by letter that funds were withheld in accordance with existing Army regulations for an actual or contingent claim against a contractor to protect the Government against possible loss. This letter advised that an investgating officer was conducting an investigation to fix responsibility for the infested cookies and crackers stored in plaintiff’s warehouse, and that if the investigation cleared Oliver-Finnie of responsibility the moneys due would be released immediately.
59. A memorandum dated December 13,1951, by Col. William E. Pheris, Chief of the Procurement Branch, Supply Division of the Office of the Quartermaster General, on the subject of the release of funds, states in part:
Captain Baker, the contracting officer on subject contracts, recommended that on the basis of the findings made by the investigating officers assigned to investigate weevil infestations under subject contracts, that “Based upon the evidence presently available, the Board is unable to fix responsibility for the insect infestation” which recommendation was made with respect to each contract, that the funds which were withheld pending such investigation be released to subject contractors. This recommendation was approved by Colonel Pheris and the funds were ordered released.
About the same time the plaintiff was advised that the amounts due on its current vouchers would be released for payment.
60. A report of “Survey” dated March 3,1952, was thereafter issued in respect to the salvage of 151,293 pounds of cookies and 366,822 pounds of crackers that had been furnished as GFP components for assembly by the plaintiff. The findings and recommendations were executed under date of April 2, 1952, by Lt. Col. A. E. Harrell, Lt. Col. John E. Grant, Maj. William B. Anderson, and Legal Officer Phillip H. Kelley. The board recommended that the plaintiff be held liable for the total cost thereof in the sum of $91,105.41, less any amount recovered through salvage *237 operations, and that all otters concerned be relieved from any responsibility. The successor contracting officer, Maj. George W. Loer, concurred in the recommendations of the board as “findings of the contracting officer”.
61. The survey form contained item 14, affidavit, which was executed by Joseph P. Dolinaj, GFP Accountable Property Officer, and item 15, certificate, which was executed by Maj. George W. Loer as successor contracting officer.
These forms were worded as follows:
14. Affidavit. I do solemnly swear (or affirm) that the articles of public property shown above and/or on attached sheets were lost, destroyed, damaged, or worn out in the manner stated, while in public service.
15. Certificate. I certify that the loss, destruction, damage, or unserviceability of the articles of public shown above, and/or on attached sheets, was caused in the manner stated and without fault or neglect on my partj and that each article listed with a view to elimination by destruction has been examined by me personally, has never been previously condemned, and is, in my opinion, worthless for further public use.
The report relied for the quality and condition of the components upon certificates of the Government inspectors at the suppliers’ plants, and upon the shipping docmnents. These documents were attached to the report. They covered 13 carloads and 6 truck loads of crackers and 5 carloads and 4 truckloads of cookies shipped by suppliers during the period May 14 to September 10,1951.
All of the cars and trucks in which the infested components were received, have not been otherwise identified in the record of the board, nor in the evidence in this case. Seven of the cars which were certified to as to quality and condition, and as containing crackers which were later found infested in plaintiff’s storage, were actually cars that contained oversized crackers, all of which were used in B-unit sub-assemblies by October 25,1851.
There were attached to the board’s report correspondence and exhibits relating to the infested components as exhibits A to PPPP, upon which the board relied. There is no substantial evidence in these exhibits to justify the finding of plaintiff’s responsibility for the infested crackers and cookies.
*238 62.On July 21,1952, tbe contracting officer issued findings of fact in respect to the GFP components of cookies and crackers addressed to the plaintiff, wherein it was found that plaintiff was liable for $89,507.08 for the same, computed as follows:
151,293 pounds cookies, with, delivery cost of-$27, 728.17
366,822 pounds crackers, with delivery cost of- 61, 882.93
89, 611.10
Less credit for salvage- 104. 02
Total_ 89,507.08
The plaintiff made timely appeal to the Secretary of the Army from the determination of the contracting officer, and the dispute was heard and considered by the Armed Services Board of Contract Appeals in ASBCA No. 1471.
63. The board issued its decision November 29, 1954, in which plaintiff’s appeal was sustained. This decision stated in conclusion :
It is unnecessary to determine, and for the purpose of this decision it may be assumed, that the food did not become infested in the bakeries. We believe that the weight of the evidence adduced before the Board adequately establishes that the infestation originated while the cookies and crackers were in transit to the appellant’s plant in railroad cars. We find also that the appellant took reasonable precaution to keep its plant and its rented warehouse space free from infestation and that its inspection of the cases of food upon receipt was reasonably careful under the circumstances. Since the infestation originated while the property was in transit off its premises, the appellant, under Article 30(a) of the contract, is not liable for the value of the cookies and crackers.
64. The decision of the board is substantially confirmed by all of the evidence in this case. The plaintiff’s plant was inspected and approved prior to the award by the Memphis General Depot Veterinarian. All outside storage warehouses were inspected and approved by Government inspectors prior to their use by the plaintiff.
The plaintiff had a continuing contract with the Orkin Exterminating Company for pest control since January 1949, which continued throughout the period of performance of the ration assembly. It provided for weekly treat- *239 meats of the entire plant, consisting of spraying all areas with, an insecticide, and the use of other materials for rodent control. Supervisory inspectors inspected the plant about once a month.
Following the discovery of infestation in cookies the Depot Veterinarian accompanied J. P. Durham of the Pure Food and Drug Administration on an inspection of the entire building November 8, 1951. In reporting to Major Bradley, who was conducting the investigation at that time, Major Quigley stated “One larvae was found in a crack in a wood floor near a location where cookies had been stored in the first basement. Except for this single larvae, there was. no evidence of any insects of any kind in the entire building.” Excepting cookies and crackers, the only other food item where any infestation was found was hi some bulk coconut stored in the basement 'adjacent to the area where cookies were stored.
65. Only one of the suppliers of bakery components sealed the cartons in which shipments were made. Others merely pasted the folding flaps. Many of the packages arrived in a damaged condition. In any event, no commercial packaging would exclude insects. Infestation has been found in hermetically sealed packages.
66. The plaintiff’s contract specified 9,282,000 cookies for delivery as GrFP amounting to approximately 464,000 pounds, whereas plaintiff was shipped 734,843 pounds, including the two carloads of infested cookies from Flotill Products, Inc., which were never placed in storage.
The contract called for the delivery of 55,692,000 crackers or approximately 1,224,000 pounds, whereas the plaintiff was shipped and received approximately 1,601,257 pounds. The quantities specified were 105 percent of contract requirements for the assembly of 4,420,000 rations.
The additional inspection, storage and handling of- the infested cookies and crackers substantially delayed plaintiff’s sub-assembly of the B-units, and on two occasions the assembly was shut down by reason of the lack of suitable components. The cost of this additional work, and the reloading of eleven carloads that were shipped to Atlanta, is not separately determinable.
*240 Substitutions, Changes, and Defective Components
67. The final assembly of the C rations required the packing of 3 cans of meat items and one can of fruit in each ration with other components. However, each of the 6 rations required a separate type of fruit and combination of meat items.
Because of the delay in the delivery of canned hamburgers when the final assembly was first authorized, other meat items were substituted for this item. The contract called for 1,547,000 cans of hamburgers which would allow one can of hamburgers for 2 of the 6 types of rations assembled. Plaintiff ultimately received 1,512,432 cans of hamburgers, so that reverse substitutions were later required.
68. The greatest number of substitutions became necessary and were authorized for the fruit items. A separate type of canned fruit was provided for each of the 6 types of C rations. None of the types specified were provided by the Government in the quantities required. The following table of GFP fruit components furnished as compared with contract requirements indicates the substitutions that were necessary:

Contract Actual Canned fruit requirements deliveries

Apricots_ 773, 500 360,000
Pears_ 773, 500 695, 760
Cherries_ 773, 500 106, 800
Plums_ 773, 500 0
Fruit cocktail_ 773, 500 145,440
Peaches_ 773, 500 573, 936
Grapefruit_ 0 1,091, 232
Pineapple_ 0 656,016
Applesauce_ 0 513,264
Prunes_ 0 727,728
Total_ 4, 641, 000 4,870,176
The overall shipment of fruit items was in excess of assembly requirements because of the high percentage of defective grapefruit which required screening and elimination.
69.The contract provided for the assembly of 2,320,000 folding can openers, which plaintiff was required to pack in the laminated foil kraft paper accessory bags, one in every other bag. In order to avoid puncturing these bags in packing, the contracting officer, on July 31,1951, directed *241 that these can openers be packed in the final shipping cases, three in each case, on top of the 6 rations. This necessitated the transfer of this item of GFP from the Canova Foods, Inc. plant to the final assembly line in plaintiff’s main plant.
70. A substantial number of B-unit cans were delivered without keys. Since these cans were fed into the assembly line by machine, some of them were filled and sealed before it was noted that the keys were missing. By October 2, 1951, 800 cans were completed without keys and were rejected and set aside. Upon the recommendation of the GFP officer, the contracting officer authorized the final assembly of the B-unit cans without keys, provided that no more than one can without key was packed in each ration. Other cans with missing keys were later authorized for assembly in the same manner.
71. Plaintiff could make no substitution nor changes in assembly procedure except upon written authorization from the contracting officer. All orders by Quartermaster inspectors required written confirmation by the contracting officer before they became final.
72. All GFP consisting of components and packing containers were consigned to plaintiff’s plant through the Government property officer, J oseph P. Dolina j. He never visited plaintiff’s plant, but was represented by James Sturm, who received incoming components, and certified to quantities and railroad damages, if any. The GFP representative was not authorized to inspect components as to quality or suitability for use in essembly. Neither could he advise plaintiff’s employees as to any defective items.
73. The plaintiff was required to accept all GFP shipped to its plant, to count and verify the quantities shown in the shipping documents; to note discrepancies, if any, and to examine all evidence of damages by the carrier, 100 percent, if necessary. Plaintiff was neither required nor authorized to inspect incoming components for their quality or suitability.
All carrier damages were screened by plaintiff’s employees and reported to the GFP representative who, upon verification, certified the damages to the Government property officer. The Government made claim against the carrier for the damaged components, and the plaintiff had to make *242 separate claims for its labor costs in screening and assorting the damaged goods.
The accountability for components consisted of checking in the number of cases or packages with the indicated contents thereof, although some sample cases were opened and the contents counted. As many as 20 cars were on occasion received in one day at plaintiff’s plant.
74. Incoming components were normally examined at the receiving docks for count and railroad damages only, except for the inspection of replacement shipments of cookies and crackers after the discovery of infestation of these items in plaintiff’s storage. The plaintiff’s receiving records reflect that 54,054 cans of meat were set aside for railroad damage claims, with costs of the surveys and segregation of these items of $20,011.82. Only 6,568 cans of fruit were set aside for damage claims, with survey costs of $580.09.
75. On July 19,1951, the plaintiff reported to the Government property officer that 10 cases of meat items of 48 cans each were examined from each of 2 carloads, which cases were intact and not otherwise damaged by the carrier. In one lot 23 damaged cans were found, and in the other lot 30 damaged cans were found, representing 4.8 percent and 6.25 percent of the lots examined.
76. In the case of B-unit cans received, the plaintiff set aside 45,640 damaged cans for the examination and certification of the GFP representatives. The plaintiff’s cost of sorting these cans was recorded at $853.88.
These cans were packed in large kraft paper cubical bags or wrappers, each containing 360 cans, some of which bags were broken open upon arrival, and cans were scattered over the car when unloading. There were some broken packages in every car, estimated by the GFP accountable officer at approximately 2 percent, and in any event something less than 10 percent. The GFP representative made an accounting only of the damaged cans, since most of the cans dispersed from broken bags were usable. Some bags were also broken open in storage by handling with a fork lift, and it is possible, therefore, that some of the dents were caused by plaintiff’s operations.
*243 Plaintiff employed a taping machine at the door of each incoming car of B-cans to repair broken bags and avoid the scattering of cans as much as possible. Plaintiff’s employees used a hand operated machine to straighten dents in cans that had been received and accepted, so that they could be properly packed and sealed. The handling of loose cans from the railroad cars, the packing and storage in open containers, and delivery to the assembly lines increased plaintiff’s handling costs of these fans.
77. The plaintiff’s assembly work was inspected by Quartermaster inspectors, and commenced under supervisor inspector Thomas B. Kennedy who was succeeded by John E. Drenttel. There were from 4 to 6 inspectors in addition to the supervising inspector, one on the accessory bag sub-assembly line, one on the B-unit assembly, two on the main assembly line, and one at the loading out area for completed rations. The plaintiff’s plant was under the area or regional supervising inspector Henry C. Davis in the Chicago Quartermaster office.
78. In addition to the Quartermaster inspectors there was a crew of veterinary inspectors under Maj. Joseph S. Quig-ley, who were mainly concerned with meat items, sanitary conditions, and salvage operations.
79. The Quartermaster inspectors were not authorized to reject any GFP and could not advise the plaintiff to do so, but any items that were found unsuitable for assembly would be set aside for the final determination of the contracting officer. However, the plaintiff was wholly responsible for any defective component or concealed railroad damages found in any completed rations.
80. Inspection standards had not been set up until sometime after plaintiff’s assembly work was in progress. The Quartermaster had a training course for inspectors, and the inspectors instructed plaintiff’s employees in the assembly lines to throw out all defective cans and other components. The plaintiff’s employees experienced difficulty in determining defects, particularly in the canned goods, and it was finally decided that plaintiff’s employees should put aside all dented cans, “swells” and “flippers” for separate screening and salvage.
*244 The Quartermaster inspectors used a pamphlet of instructions entitled “Standard Inspection Procedure”. Plaintiff’s president asked for a copy of this pamphlet, but was never furnished one, as there was only one copy. This copy was made available to plaintiff.
81. All initial inspection and screening were performed by plaintiff’s employees. Extra help was put on the assembly lines for this purpose. The final inspection and determination of suitability or condemnation of any component were made by the Veterinary inspectors. About the end of July 1951 a salvage room was set up for rescreening components that had been put aside on the assembly, and one of plaintiff’s employees was especially trained to perform this work.
82. During the period from about July 30 to November 29, 1951, approximately 48,908 cans of meat and 64,150 cans of fruit were returned to the salvage room for rescreening. Upon reprocessing these defective cans 15,509 cans of meat were returned to the line for assembly; 24,009 cans were transferred for immediate issue to troops, and 9,390 cans were destroyed. Some 8,466 cans of fruit were returned to the assembly line; 12,003 cans were transferred for immediate issue, and 43,681 cans were ordered destroyed. Whenever any lots of components were found to contain excessive defects, such lots were set aside and screened separately by plaintiff’s employees.
83. After rations were completed and packed for shipping, final inspection was made by lots or carloads, containing several thousand cases of 6 rations each. Inspection was performed by samples of 75 cases in each lot, which samples were opened and the contents inspected. Whenever five or more major defects were found in the samples, the entire lot was rejected, requiring the reopening and reassembly of these lots. The rejections related largely to defective components rather than to defects in assembly. Only two lots were rejected, and one rejection was withdrawn.
84. On September 6, 1951, the supervisory Quartermaster inspector rejected lot 29, containing 3,873 cases of 23,238 rations, on the basis of five major defects found in the samples inspected, consisting of 3 cans of grapefruit flippers *245 or springers, one torn accessory bag, and one accessory bag with imperfect seal. Only four major defects were allowed in samples inspected for any one lot.
In reporting the rejection of this lot, the chief Quartermaster inspector advised the contracting officer that approximately 10 percent of the grapefruit cans were defective; that the plaintiff had been warned to screen them thoroughly before assembly, but that this had not been started until the rejection was made. On the same day the contracting officer wired plaintiff that the grapefruit should be screened prior to using on the assembly line, to preclude rejection of the final pack.
The rejection of lot 29 of completed rations was reversed by the regional supervisory inspector “in all fairness to the contractor” and plaintiff was advised of its acceptance September 11,1951.
85. The plaintiff was required to pack a can of jam in 2 of the 3 B-units that were finally assembled in each ration. Out of 9,298,608 cans shipped to plaintiff only 2,283 cans were set aside for certification of damage claims against the carrier by the GFP representative. Plaintiff’s employees experienced difficulty in packing this item because the cans were stuck together. Sometimes an entire case stuck together and the cans could not be separated. The plaintiff employed an extra man on the B-unit sub-assembly line to separate the jam cans for packing.
86. The contract schedule of GFP provided 23,205,000 packets each of sugar, soluble coffee and milk, amounting to 5 packets for each ration. They were packed in both the B-unit cans and the accessory bag sub-assemblies.. These items were generally received in cases of 1,000 packets each. Sugar was sealed in 6 gram packets.
87. On June 22, 1951, plaintiff wrote the Government property officer that a check of 10 cases of sugar for count revealed a shortage in the number of packets. An examination of these 10 cases revealed that 6 cases were short 105 packets and 4 cases were over 96 packets, leaving a total shortage of 9 packets for the 10 cases inspected. If this was typical of the entire shipment, a shortage of approximately 3.825 cases would result. On June 28, 1951, Joseph P. *246 Dolinaj, GFP Accountable Property Officer, wrote plaintiff that shipping papers should be executed for the actual number of cases received, and that the matter of shortage would be taken up with the supplier. This letter stated in part :
If correction is not in effect this office will not hold you 'liable for any shortage existing on the completion of your contract on these items, if records indicate a defective amount due to incorrect count at point of origin.
At that time more than one-half of the entire requirements of sugar had been received and stored by the plaintiff.
88. Upon the complaint of leaking sugar packets by the assembly foreman, Chief Quartermaster Inspector Kennedy made a spot check of 5 boxes and found “leakers” in all of them. The chief inspector reported the result of his check of these cases to the Chicago Depot July 14, 1951. The test check of the 5 cases examined revealed 1,334 leak-ers, 89 short, and 3,571 good packets. At that time the plaintiff had received 17,700,000 packets of sugar all shipped from the Cumberland Packing Company under a Government supply contract.
89. The chief Quartermaster inspector held that all “leak-ers”, including coffee and milk packets, would be held as defects if 'assembled in rations. When any lot being assembled was so bad that it could not be screened and segregated in the line of assembly, it would be set aside for rescreening or salvage. Government personnel performed portions of this screening and segregating work. On August 30,1951, the GFP representative wired the Chicago office that the rescreening of 5,000 packets of sugar of the lot which had been set aside, showed over 90 percent defective and that a trial run on the line was not practicable.
90. On October 10,1951, the plaintiff was advised by letter from Major Lauer that the supplier would ship 2,000,000 additional packets of sugar to replace the sifters found in the original shipments, and that other sifters should be set aside and reported as soon as final quantities could be determined. The original supplier finally shipped plaintiff over 26,000,000 packets. Another assembler transferred and shipped 1,235,000 in September 1951, most of which was *247 also found defective. Finally, approximately 635,000 packets of sugar were transferred to plaintiff by the Quartermaster Depot in January 1952, which were used to complete the assembly. Total shipments and transfers of sugar packets for plaintiff’s assembly exceeded 27,900,000 packets, or approximately 20 percent in excess of contract requirements.
91. Plaintiff experienced similar difficulties with defective packets of dry milk and soluble coffee powder but to a much lesser degree. Plaintiff was shipped 24,205,000 packets of coffee and 24,389,000 packets of dry milk, less than 5 percent in excess of its contract requirements.
92. The plaintiff increased the number of employees on both the B-unit sub-assembly lines and on the sub-assembly of the accessory packet in order properly to screen out defective packets of sugar, milk and coffee. It also employed additional personnel for rescreening other lots of these components that had been set aside because excessive defects could not be properly eliminated in the line of assembly.
The excessive costs incurred for this additional work are not separately determinable.
93. About 1,091,232 cans of grapefruit were shipped to plaintiff, of which 1,296 cans were set aside because of damage in transit. Grapefruit was supplied as a substitution, in part, for' other fruit items specified.
The plaintiff’s employees experienced much difficulty in the final assembly because of the great number of defective cans. Most of the defective grapefruit cans consisted of swellers and flippers which resulted in the rejection of the completed cases: ■ These could not be readily detected in the rapid handling of these items in assembly.
On September 6, 1951, the chief Quartermaster inspector reported- to the contracting officer that approximately 10 percent of the grapefruit cans were defective, and that the plaintiff was directed to screen the grapefruit thoroughly before placing in the rations. The contracting officer immediately wired plaintiff to screen the grapefruit prior to using it on the assembly line, specifically for swellers, flippers and rusty cans, any of which would be held as a defect, if used in assembly.
*248 About September 28, 1951, the supplier’s representative picked up 6,480 cans which were unfit for assembly, and early in December 1951, the GFP representative turned over approximately 31,680 cans of grapefruit to the Memphis General Depot for disposition.
94. Similar screening was necessary, in lesser degree, for canned prunes, peaches, and pineapple, but most of the screening was performed in the assembly line. The plaintiff was required to set aside shiny cans (not camouflaged), and unlabeled cans until their use was authorized in writing by the contracting officer.
95. The plaintiff was required to pack one accessary bag as a sub-assembly for final assembly in each ration. The sub-assembly of the accessory bags was performed at the plant of Canova Foods, Inc., about three-fourths of a mile distant from the main plant where final assembly was performed. The plaintiff was furnished foil-lined kraft paper bags, packed flat in boxes of 1,000 each. The plaintiff employed a smooth wooden wedge to open the bags in the assembly line. Upon filling the bag plaintiff was required to seal the top for a watertight package.
The bags shipped to plaintiff came from various sources of supply. A substantial portion of these shipments were defective in that the foil liners were fused together and could not be opened; others would open with much care and difficulty, and many tore in the opening process. In some lots the bottom and side seams were not properly sealed, and came apart when the bag was packed. Many were not waterproof as required by the specifications for these bags.
96. Upon complaints of the plaintiff the GFP representative reported the conditions complained of to the property accountable officer on July 24, 1951, who in turn referred the matter to the purchasing office responsible for supplying the bags. By a first memorandum endorsement thereon, dated July 27, 1951, the purchasing agent reported that the bags referred to “meets all contract requirements, as evidenced by inspection and final acceptance at bag suppliers’ plants. Because these bags have been tested and accepted, and are Government property, every effort should be made to utilize as many of them as possible.”
*249 The contracting officer thereafter advised plaintiff that the accessory bags had been accepted by Government inspectors and that it was plaintiff’s responsibility to screen these bags to assure suitability for inclusion in rations.
97. The purchasing agent expressed the belief that the reported 50 percent breakage during opening should be vastly improved, and that assembler should be cautioned against careless and high speed opening of bags, since they were flexible, and not primarily designed to take the abuse of containers such as cans and jars. Tests of bags at the Quartermaster depot found all of them satisfactory. Only the Houser Packaging Corporation furnished accessory bags to the Quartermaster Depot. This supplier furnished 409,600 to the plaintiff, of a total of over 5,000,000. The purchasing agent decided to request authority from the Quartermaster Food and Container Institute to waive the results of submersion tests to the same extent as already authorized for the current 5-in-l ration with a view to eliminating a portion of the current and anticipated future trouble in respect to the C rations.
98. On August 4,1951, the Quartermaster inspector wrote the contracting officer that 3 lots of 89,516 completed bags had been provisionally rejected because of “leakers in water tests”. The waterproof requirement was waived thereafter, but submersion tests continued by the inspection division until August 30,1951.
99. By memorandum to the GFP agent September 12, 1951, the plaintiff advised that 750 bags had been used by the inspection division for submersion tests from June 18 to August 30, 1951; 78,506 bags were damaged from July 13 through September 11; 233,000 bags had been set aside because they were hard to open or stuck together, and 1,943,590 had been filled.
100. On November 26, 1951, the inspector in charge rejected lot No. 190 of 1,247 master cases, containing 7,482 completed rations because of five major defects, consisting of one badly dented meat can and four accessory bags with holes or tears. Plaintiff protested the rejection of this lot to the contracting officer on November 26, on the basis that the accessory packets were not waterproof since the rejection *250 of non-waterproof bags bad been waived in August 1951. Plaintiff requested advice as to whether accessory packet operations should be closed, pending the arrival of specification bags, or whether those already furnished should be used. No reply was made to this protest.
101. On November 28,1951, plaintiff wired the contracting officer of the provisional rejection of a carload of 2,584 cases of completed rations because of two accessory packets declared as major defects, and three dented cans, advising that the car was loaded and had already been pulled out by a switch engine, but the plaintiff would attempt to stop it. Plaintiff again requested advice on the use of leaky bags. No reply to this request was made by the contracting officer. Plaintiff closed its assembly of accessory bags the first week of December 1951.
102. On December 18, 1951, the GFP representative advised plaintiff that the property officer was sending 160,000 additional bags from Hills Brothers; that some would be defective and could be set aside; but that these should be sufficient for completing the additional assembly required. These 160,000 bags were received December 27, and an additional replacement shipment of 75,175 bags was transferred from the Chicago depot in January 1952.
103. On December 3,1951, the plaintiff wrote the Chicago Quartermaster Inspection Division in reference to components, and the foil-lined accessory packets, stating in part:
This company requests to be informed why the Inspector m charge has refused to assume responsibility for inspection, verifications, and when necessary to issue proper set aside orders for components which obviously do not meet requirements for the purpose intended.
In response to plaintiff’s inquiry, the successor contracting officer wrote plaintiff December 6, 1951, in part:
It is the opinion of this office that neither the Inspector-in-Charge nor the GFP Agent is responsible for the initial or on line inspection of GFP, but rather that this is the responsibility of the contractor. The following is quoted from clause entitled “GFP Inspection” on Page 6 of your contract
“It will be the responsibility of the Contractor .to inspect all Government Furnished Property arriving at its plant for condition and count and to promptly *251 annotate Bills of Lading and Vendor’s Shipping Documents as to any shortage or damage after notice to and verification by Government Inspector. The Contractor will, at its own expense, furnish the labor for such inspection including a 100% inspection if considered necessary by the Contracting Officer.”
104. Plaintiff was then advised that when any GFP was “tentatively determined” to be unsuitable by the assemblers, it must first be brought to the attention of the GFP agent, who in turn would call upon either the Quartermaster inspector or a Veterinary Corps inspector for verification, and only then could the GFP agent set aside such items for further instructions from the contracting officer.
105. The quotation from plaintiff’s contract by the contracting officer refers specifically to the inspection of GFP for any shortage or damage upon arrival, and not to the defective components furnished for assembly in rations, not otherwise damaged by the carrier.
Components damaged in transit were never charged to plaintiff, but, upon certification of the GFP agent, became the subject of a claim against the carrier by the Government’s accountable property officer. Thereafter, plaintiff was entitled to make claim against the carrier for its labor costs in surveying the damages and assorting damaged items.
106. On December 18,1951, the GFP representative wrote the Chicago GFP property officer in reference to a conference had with plaintiff’s officials on December 11, 1951. The plaintiff’s complaint was that the defective accessory bags increased the sub-assembly costs substantially by reason of screening out defective bags and the employment of an extra girl on the line for opening bags to avoid a slow-down on the entire line; and that after accessory bags were packed, sealed and inspected at the Canova plant, the manufacturer’s seals would pop open before they were finally assembled in the completed rations at the main plant, and would have to be returned for reassembly, resulting, in double handling. The plaintiff asked that an investigating officer be sent to the plant while operation was still in, progress. The contracting officer approved this plan, and advised the plaintiff that an investigating officer would visit *252 the plant on or about January 7, 1952. Maj. Andrew J. Draper was appointed December 28, 1951, as a one-man board and commenced his investigation January 7,1952.
107. Major Draper was experienced in the assembly of rations, having been in charge of the assembly of C rations and other types at the Chicago Quartermaster Depot from about August 1,1950, until about the end of November 1951, when he took over as chief of storage for the Depot.
On the morning of January 7, 1952, Major Draper visited plaintiff’s plant and the assembly line for accessory bags. He timed the actual production of accessory bags for approximately 20 minutes, and found that the average output was 94 bags per minute. The plaintiff had 35 employees on the line at that time, but plaintiff conceded that actual operation of 450 minutes in an 8-hour day was considered good. Thus the daily output would be 42,300 per day, or 1,208 per day for each employee. This represents an average hourly output for ¿ach employee of 151, for an 8-hour day, or 161 for 7.5 hours of actual operation during an 8-hour day. This production compares with plaintiff’s planned engineered production of approximately 158 packets per hour for each employee.
108. Except during the last week of May and the first week of June 1951, the plaintiff employed an average of 38 to 48 workers on the accessory bag sub-assembly line. The average daily production was 21,000 in June; 25,000 in July; 31,000 for August; 35 to 40 thousand in September and October, and 39 to 42 thousand in November 1951. Plaintiff’s actual average production was approximately 97 packets per employee-hour.
109. Major Draper found from actual experience that the approximate normal production was 1,000 accessory bags per day for each employee, or 125 per hour. During the period from July to December 1951, the Chicago depot assembly operations averaged approximately 128 packets per hour for each employee.
110. Major Draper further found that the plaintiff had received approximately 5,005,600 accessory bags at the time of his investigation. Plaintiff received 75,175 additional replacement bags from the Chicago Quartermaster Depot *253 on January 14, 1952. On January 7, 1952, plaintiff had accounted for 170,483 unsatisfactory accessory bags or 3.4 percent of the total received. The investigating officer determined that 85,095 of these unsatisfactory bags represented rejected packets which required reprocessing, so that the remaining 85,388 would represent defective bags from suppliers.
111. The investigating officer reported his findings as follows : “That the suppliers of laminated foil kraft bags are allowed a tolerance of 2y2% of the total number of bags supplied to be defective due to manufacturing difficulties.” This tolerance would amount of 125,140 for the quantities received, which was in excess of 85,388 or 1.7 percent found to represent defective bags from suppliers. On the other hand the 85,095 bags rejected after assembly represented 1.7 percent of the total received. Plaintiff’s tolerance allowance was only one-half percent. The investigating officer recommended that any claim for faulty laminated foil kraft bags be disapproved, and this recommendation was approved by the commanding officer January 14,1952.
112. The investigating officer charged plaintiff with the 85,095 accessory bags which were rejected after assembly and required repacking, although there is nothing to indicate the proportion of these rejected bags which represented manufacturers’ defects. The tolerance allowance of .5 percent for loss and damages in the assembly would apply only after the plaintiff had screened, set aside and obtained the approval of the contracting officer for eliminating the defective bags from assembly. Many of the bags that had been packed burst along the side or bottom seals, which was sufficient cause for the rejection.
113. The final accounting by Watt D. Blakemore, the supervisor for the accessory bag sub-assembly at Canova Foods, Inc., reported 196,777 bags that had been turned over for salvage, of which 185,000 split or tore during opening or packing.
In the final schedule of GFP by the Government property officer, 177,075 accessory bags were noted with manufacturers’ defects. The plaintiff was charged with 19,675 damaged in processing, plus an unaccountable variation of *254 16,525 bags, with a tolerance allowance of only 23,087, or a net charge of 13,113 accessory bags.
114. Approximately one-half of the cartons for packing the final menus were supplied with slitted closing flaps instead of the notched type specified for properly locking the packed ration. When these cartons were packed and sealed any pressure applied in packing these completed rations into the shipping case would cause the covers to pop up because of improper lock. This condition required resealing of the cartons, replacing them in the case, and holding them down until they could be glued by the sealing machine.
This operation necessitated the employment of additional help at the end of the final assembly line, but the cost of using these slitted type cartons is not determinable and was probably minor.
115. The plaintiff experienced some difficulty in obtaining production in strapping the packing cases of six completed rations. The contract specifications required that these shipping cases be bound with a flat steel strap for export shipments.
On August 30, 1951, the plaintiff requested a waiver of the specification for steel strapping with permission to use a 16-gauge 70 to 90 psi round wire which could be handled by a semi-automatic strapping machine, in order to speed up production. The contracting officer denied any deviation from the specifications on strapping of the shipping cases.
In order to avoid an accumulation of completed rations, the plaintiff’s strapping employees worked one-half hour extra per day and 8 hours on Saturday, for which plaintiff paid premium pay for overtime. From July to December 1951, the plaintiff’s strapping employees performed work on 9 Saturdays. The increased cost represented by the premium pay for strappers was only a nominal sum, amounting to less than $300.

Prior Claims

116. On January 7,1952, prior to the completion of the C ration assembly, the plaintiff submitted to the contracting officer a claim for $144,233.30 as increased costs resulting *255 from the delay of 56 days by the stop order of June 5,1951, and the defective components furnished by the Government.
About the end of March 1952, one Donald R. McMillan, Chief of the Cost and Price Analysis Section of the Chicago Quartermaster Depot, arrived at plaintiff’s plant and discussed plaintiff’s claim with Robert M. Holt, president. Plaintiff’s revised claim which was in the process of preparation following the completion of the assembly of the C rations, was discussed with McMillan. McMillan advised Mr. Holt that plaintiff’s claim should contain a breakdown of the actual man-hours with the rates of pay for employees engaged in screening GFP, and that the claim would be considered on that basis. McMillan made no examination of plaintiff’s records and did not attempt to verify any part of the claim as submitted.
117. The investigation of plaintiff’s claim was made by Kenneth R. Howland, an accountant from the Army Audit Agency, sometimes referred to as “AAA,” in Atlanta, Georgia. He arrived at plaintiff’s plant about April 1, 1952, and was assisted by Theodore G. Schaeffer, an industrial specialist. The AAA audit covered a period of approximately one month, and a report of audit was issued June 30, 1952.
118. On April 25, 1952, plaintiff submitted its revised claim for $448,270.01 with detailed schedules covering excess costs claimed. This revised claim included plaintiff’s actual costs for outside storage, excessive storage in its own building, and the difference between its warehousing labor and a fair and reasonable rate charged commercially of 4 cents per cwt. for materials and components handled. The excess labor on assembly lines was computed at the difference between the actual assembly line labor and a bid rate, sometimes referred to as an “engineered” cost of assembly. The claim included estimated costs for legal and accounting expense of $25,000, fumigation expense of $12,000, and a loss of profit of $86,687.04.
119. The AAA audit reported plaintiff’s book costs for 1951 and certain costs relating to the C ration assembly for 1952. Plaintiff claimed that its cost of the C ration assembly was $598,582.13, and the Army auditor started with this *256 figure. From this sum the AAA auditor reclassified and transferred $11,186 to capital items, the net sum of $3,882.21 to the plant overhead pool, and $5,073.81 credits applied for the recovery on the sale of containers salvaged. From the remaining book costs of $578,440.11, the AAA auditor eliminated questioned costs of $180,312.90 to arrive at accepted costs of $398,127.21.
Engineering fee of $3,000 was eliminated because the records failed to indicate the extent or nature of services performed. The AAA determined intercompany profits of $88,270.42 on the billings by Canova Foods, Inc. on the basis of costs determined for the accessory bag assembly, which were eliminated. Plant and general overhead allocations of $123,796.10 were reduced by $89,042.48.
The AAA auditor made reallocations of plant and general overhead expense for the plaintiff’s costs as well as the Canova Foods, Inc. Plant overhead was allocated on the ratio of direct labor, but the general expense was allocated on the basis of total costs, other than general expense. In both instances only the 1951 records were employed for allocating overhead expense.
120. There after an unsigned and undated report was prepared by D. R. McMillan of the Cost and Price Analysis Section, for the contracting officer, and submitted sometime in August 1952. This report was supported in part by theoretical storage requirements on the basis of the revised delivery schedule for completed rations. There are few substantial facts hi this report upon which the contracting officer could make a determination of the actual costs to the plaintiff, or excess cost, if any.
121. A meeting was held in Chicago on September 8-9, 1952, between the plaintiff, represented by its president, Mr. Holt, plaintiff’s attorney 'and an accountant, and the contracting officer with at least six other Government officials.
There was no one issue in plaintiff’s claim that was resolved in this conference, so that the entire claim remained in dispute. The contracting officer and his representatives took the position that plaintiff must compute its claim on the basis of the number of employees that could be proved *257 to have engaged in screening of GFP with the number of hours and rates of pay for such employees; that the difference between the total costs and plaintiff’s estimated or engineered costs could not be accepted. The plaintiff pointed out that most of the screening was performed on the assembly line, involving 'all employees in the slowdown of operations. Only those lots containing a great number of defects were set aside for separate screening by individual employees. Plaintiff was advised that unless the claim was documented in the manner requested, it should be taken to court immediately.
122. On September 23, 1952, the contracting officer wrote plaintiff that the claim for warehouse storage charges must be denied entirely, and that certain other items of plaintiff’s claim could not be allowed on the basis presented. The plaintiff protested this letter, as not in accordance with the understanding reached at the conference, and not in good faith for the negotiation of the claim. The plaintiff requested that findings be made on each item of the claim.
123. Upon repeated requests for findings, the contracting officer wrote plaintiff’s counsel on March 6,1953, that findings of fact would be rendered as soon as practicable. Again on March 23,1953, the contracting officer wrote plaintiff’s counsel that the investigation of plaintiff’s claim was nearly completed, and that findings would be rendered within the next week. Finally, on July 6, 1953, the legal officer at the Chicago Quartermaster Depot wrote plaintiff that due to the complicated nature of the matter, and a transfer of jurisdiction to the Quartermaster Market Center System in Chicago, it was not possible to complete the findings prior to the movement of personnel to their new headquarters. Plaintiff’s claim was thereafter filed in this court on July 20, 1953.
124. On July 31, 1953, the contracting officer reported to plaintiff findings of fact on its claim of April 25, 1952, pursuant to the disputes provision of the contract. In these findings the contracting officer denied each item of plaintiff’s claim, except the cost of additional packing cases for storing the completed sub-assembly of B-units during the period prior to July 16,1951, in the sum of $883.60. It *258 was also found that plaintiff failed to account for GFP valued at $1,915.21, and that the deletion of plastic spoons from 3,225,650 rations, required an equitable adjustment of $3,225.65, for which plaintiff was indebted to the Government.
By amended findings issued November 9, 1953, the contracting officer reported that the plaintiff’s indebtedness for the omission of plastic spoons was offset, in part, by the withholding of $3,000 from payments otherwise due plaintiff.
125. The plaintiff wrote the contracting officer that the findings of the contracting officer were not binding upon plaintiff, since he lacked jurisdiction, because of failure to issue the findings within a reasonable time after the receipt of plaintiff’s claim. However, the plaintiff made an appeal from the findings of the contracting officer to the Secretary of the Army on August 28,1953.
No action was taken upon plaintiff’s appeal, since plaintiff had previously filed its petition in this court.

Contract Termination Claim

126. The plaintiff contends that the stop order of June 5, 1951, the substitution of components, and the defective components and packaging materials supplied by the Government, constituted a termination of the original contract; that the assembly of the C rations under a different period of performance with the required screening of components and packaging material, was compensable under an implied contract, at a fair and reasonable cost and profit.
The plaintiff’s assembly operations were substantially completed by January 19,1952, and final shipments of rations were completed January 24, 1952. The transfer of residual GFP continued until about the end of March 1952, and some costs were incurred thereafter. However, the parties have considered and used the period from April 1951 to March 1952, in the allocation of certain indirect expenses hereinafter reported.
The following costs are directly attributable to the C-ration assembly at plaintiff’s main plant:
*259 1951 195 2
Direct labor_$221,510. 33 $22,575.69
Engineering fee- 3, 000. 00
Packaging materials- 26,852.28 813.16
Outside warehouse rentals_ 27, 051. 86
Switching and demurrage_ 7,112. 02
Total___ 285, 526.49 23,388. 85
127. The engineering fee first questioned by the AAA auditor was for the services of William C. Carson, a mechanical engineer, and vice president and director of the plaintiff corporation. Mr. Carson was engaged for the period April 6 to August 15, 1951, in the planning and installation of the assembly equipment, and the supervision of its operation. Approximately $59,000 additional equipment was acquired, consisting of pallets, jacHifts, forklifts, and much special equipment which included conveyor belts, compressors, can handling equipment, and electrical installations. Mr. Carson received no salary, nor other compensation during the period he was engaged on this work. The fee is fair and reasonable.
128. The Ballard & Ballard Building, which was across the street from plaintiff’s main plant, was acquired by purchase June 15, 1951, and was used for storage purposes. Bental of $135 was paid for this building for the first half of June. In addition to the Ballard Building, the plaintiff engaged other public storage, beginning June 8, 1951, in the Poston warehouse, Shelby warehouse, Mayer No. 2 warehouse, and the Memphis Compress & Storage Company warehouse. Plaintiff stored in outside warehouses approximately 166 carloads of GFP out of a total of about 542 carloads and 170 truck or trailer loads of components and packaging materials received. The rental of additional storage was attributable entirely to the stop order which precluded any outflow of materials until July 23, 1951. The continued rental of portions of outside warehouses until December 1951, was attributable, in part, to delays in assembly, by reason of substitution of components, screening of components and packaging materials, and the extra inspection and disposition of infested cookies and crackers.
129. Plaintiff incurred other costs that were directly assignable to the C-ration assembly work. These costs include the following groups or classifications:
*260 (a)During the period of the stop order, the plaintiff performed sub-assemblies of the accessory bags and B-imit cans. Additional packing boxes were required for the completed B-cans which accumulated prior to July 16, 1951, when they could be used in the final assembly. Excessive shipments of components required outside protection from time to time, and the plaintiff purchased tarpaulins for this purpose. As a result of the stop order and delay in assembly operations, the plaintiff had to acquire extra heating equipment for use in the assembly room during cold weather. Plaintiff had prepared photographs of defective and infested components received. All of these extra costs were necessary and are properly assignable to the C-ration assembly, as follows:

1951 1952

Packing cases_ $883. 60 _
Extra heating equipment_ 674. 74 _
Tarpaulins_ 233.15 _
Photos_ 95. 88 $103.03
Total- 1,887.37 103.02
(b)The plaintiff acquired and employed much special assembly equipment and warehouse equipment, exclusively for C-ration assembly, and provided a separate office for Government inspectors. The depreciation thereon is properly assignable to ration assembly costs as follows:

1951 1952

Assembly equipment_$4, 043.12 $1,499.45
Warehouse equipment_ 3. 083.18 150. 00
Office furniture and equipment_ 400. 00 25.00
Total- 7,526.30 1,674.45
(c)In addition to the cost of depreciable equipment and installations for the assembly of C rations, the plaintiff incurred expenses for repairs, plumbing and partitions for the assembly department, the rental of machines and supplies and services for assembly employees, all of which are properly assignable to costs of C-ration assembly.
The plaintiff also included a portion of the regular pest control expense with this classification, which might have been allocated with other overhead expenses. The plaintiff paid the Orkin Exterminating Company $100 a month for weekly inspection and treatment of plaintiff’s plant for pest *261 control. Plaintiff assigned only $500 of this cost to C-ration assembly as overhead expense. This amount is less than the portion that would be properly allocable as overhead expense. A summary of these expenses follows:
Repairs, plumbing and partitions for iosi lass the assembly department_$10,419.23 _
Supplies and linen service_ 4,293. 92 _
Rental of machines_ 2, 755.36 _
Freight_ 574.26 _
Sundry expense_ 2,429.37 ( — $12.47) Cr.
Pest control_ 400. 00 100.00
Totals_ 20, 872.14 87. 53
130. Plaintiff recovered on railroad freight claims and the salvage and sale of waste packing materials sums which are proper credits against C-ration assembly costs, as follows:

1951 1952

Recovery on freight claims_$1, 785. 61 $882. 00
Sale of waste paper salvage_ 4,131.47 942.34
Total recoveries_ 5, 917.08 1,824. 34
131. The net additional costs, after credit deductions properly assignable to the C-ration assembly, were $24,368.73 for 1951 and $40.66 for 1952.
132. Plaintiff incurred other expense classifications, not directly assignable to any one of the operating departments, which plaintiff allocated on the same ratio as the direct labor costs in each department. The total direct labor incurred in each department appears as follows:

1951 1952

Amount Percent Amount Percent

C-ration assembly_$221, 510. 33 75.71 $23, 819.28 18. 89
Candy department_ 60,337.28 20. 62 92,232. 97 73.11
Coffee department_ 10,719.71 3.67 10,100.19 8.00
The ration assembly labor for 1952 exceeds the direct labor claimed in assembly operations by approximately $1,243.59, and it is concluded that this represents the additional labor beyond the assembly period which ended with March 1952, in packing and disposing of unused GFP remaining in the plant. The defendant does not contest the correctness of direct labor for the separate departments.
133.The defendant’s AAA auditor reclassified certain in *262 direct expense as plant overhead, which was allocated on the basis of direct labor for 1951 only. The 1952 costs were not determined by this auditor. However, the total 1951 direct labor was incorrectly determined at $192,561.71, and the direct labor for the assembly of C rations at $131,462.10. General administration expense was allocated upon the basis of the costs of sales for 1951. This is not a fair and reasonable basis for the allocation of general administration expense for the type of operations performed by the plaintiff.
134. In 1955 an FBI auditor made an examination of the plaintiff’s books and records. The plaintiff’s direct and assignable costs were verified substantially as claimed. But other indirect expense was allowed on the basis of sales, after the elimination of green coffee sales which were made by the plaintiff as an agent or broker, and the elimination of black pepper sold to the Government under another contract.
135. During 1951 the plaintiff’s overall sales were $3,154,-050.85. Green coffee and black pepper constituted $2,214,-744.47 of such sales. The plaintiff acted as agent or broker for the disposition of green coffee imports, and never received or handled any of this coffee. The amount of the black pepper contract was not separately reported. Sales, other than green coffee and black pepper for 1951, were made in these approximate amounts and percentages:

Percent

Coffee department_$306,219. 00 32.49
Candy department_ 307,904. 00 32. 78
C-ration assembly_ -326,183.38 34. 73
Plaintiff’s 1952 sales, other than green coffee and black pepper, amounted to $739,266.31, of which C-ration billings of $36,897.86 represented 4.99 percent.
136. Plaintiff’s C-ration assembly contract was primarily a service operation, and did not involve any materials other than a small part of the packing material. Thus the cost of sales of C rations consisted largely of labor, storage and other service. By comparison the direct labor in processing and packaging coffee constituted only 3.51 percent of the total sales of such coffee, and only 3.67 percent of the total direct labor performed during 1951. The principal *263 cost of coffee sales is represented by the cost of green coffee. Even at 50 cents a pound the sales of $305,219 would represent little more than 600,000 pounds of coffee processed and sold. The same would be true in respect of the proportionate cost of candy sales, but not to such a pronounced degree. The quantity of materials involved in processing coffee and candy was comparatively small in relation to the values.
137. The GFP shipped to plaintiff for C-ration assembly had an overall shipping weight of approximately 32,000,000 pounds, of which 23,835,210 represented components and 8,178,960 represented packaging materials. The plaintiff assembled and shipped 4,617,390 rations packed in shipping cases of 6 rations each. These cases weighed approximately 38 pounds each, and represented approximately 29,243,470 pounds. By including the value of components furnished by the Government, these C rations had a value in excess of $2 each, or a total value in excess of $9,000,000.
The allocation of indirect costs on the basis of sales would not be fair and reasonable for the apportionment of such costs to a service contract of the type involved herein.
138. Allocable indirect costs for the calendar year 1951 were $122,356.52, and for 1952 were $123,645.55, after eliminating all expense for which no part would be properly allocable to the C-ration assembly operations. These costs consist of the following group classifications:

(a) Receiving and shipping expense:

1951 1959

Salaries and wages_ $9, 513. 27 $12,860. 56
Truck operating expense_ 1,294. 95 1,444.17
Depreciation_ 952.20 1,213.90
Miscellaneous_ 102.74 12.84
Totals_ 11,863.16 15,531.47
(b) Heat, light, power and depreciation:

1951 1952

Salaries and wages_ $6, 024. 03 $13,185.23
Fuel, freight & handling_ 9,414. 55 9,385.12
Supplies_ 2,021. 50 1, 626. 93
Repairs_ 954.78 612. 55
Depreciation_ 3,227.78 3,242.11
Miscellaneous_ 24.08 6.00
Totals_ 21,666.72 28,057.94

*264
(o) General & administration expense:

1951 1959

Salaries and wages_ $47,348.22 $47,430. 97
Office supplies & stationery_ 2, 089. 02 6,235.13
Postage_ 1,348.48 1,628. 81
Telephone and telegraph_ 5, 773. 09 6,265. 06
General repairs_ 2,422. 05 1, 605.15
Attorneys’ fees and costs-2,161. 80 937.76
Auditing_ 800. 00 1,750. 00
Depreciation_ 1,300. 00
Dues and subscriptions_ 1,752.18 1,971.30
Payroll taxes_ 14,530.73 6,265.49
Other taxes_ 3,478.73 6,992.24
Insurance_ 7, 986.40 8,227.44
Watchmen & detective service_ $5, 724.22 $5, 592.47
Miscellaneous_ 224.22 258. 96
Sub-total_ 95, 639.14 96,460. 78

Less:

Administrative fees_ 16,824.74 18,954.64
Canova administration (contra) 10, 012.24 2, 550.00
Net deduction_ 6, 812.50 16,404. 64
Totals. 88, 826. 64 80,056.14
The foregoing groups of allocable expenses exclude all costs where no part thereof would be applicable to the C-ration assembly operations. Such costs include all sales expense, travel and advertising, a part of the fuel expense, all interest and discount expense, bad debts, contributions and other items not necessary for the ration assembly operations. The total of such expenses is $86,618.01 for 1951, and $66,254.79 for 1952. The plaintiff charged its subsidiary, Canova Foods, Inc., administrative expenses of $10,012.24 in 1951 and $2,550 in 1952, which are added back in the above tabulation and deleted from the administrative expenses of Canova.
139. A fair and reasonable apportionment of the foregoing allocable expense is on the basis of direct labor in the various departments operated. The amount applicable to the C-ration assembly operation is 75.71 percent of $122,356.52 for 1951, amounting to $92,636.12; the amount applicable for 1952 is 18.89 percent of $123,645.55, amounting to $23,356.64.
140. The sub-assembly of accessory bags was performed *265 by Canova Foods, Inc., a wholly owned subsidiary, in a plant separate and apart from the plaintiff’s main plant. On June 11,1951, plaintiff entered into a contract with Can-ova Foods for the sub-assembly of the accessory package, at 3 cents each, for which it was paid $138,521.70. Plaintiff claims these payments as an item of performance cost, less intercompany profit to Canova, computed at $62,808.87. The proper determination of the cost for the sub-assembly of accessory bags would be the actual cost to Canova Foods, Inc.
The sub-assembly of the accessory bags was performed during the period from about the end of May 1951, until the middle of January 1952. Like other assembly operations, the performance consisted largely of services, and the use of equipment in the Canova plant. The direct costs appear as follows:
Direct labor_$40,383.19
Payroll taxes_ 928. 80
Assembly expense_ 2,613.76
Loss on machinery scrapped_ 1,214.36
Total- 45,140.11
Indirect costs properly allocable to the accessory bag sub-assembly, as set forth in the following finding, amounted to $27,273.73. The total cost of accessory bags assembly was $72,413.84.
141. Neither the total direct labor nor the total indirect expense was furnished for the fiscal periods within which the accessory bag sub-assembly was performed. The fiscal years of Canova Foods, Inc. ended July 31. The AAA auditor determined that the direct labor on the sub-assembly of accessory bags for the period August 1 to December 31, 1951, was $27,674.29, representing 67.9 percent of the total direct labor of $40,757.45 for that period.
During the performance period Canova Foods incurred factory expenses and general administration expenses as set out in the following tabulations, but exclusive of all items that were not allocable to the sub-assembly of accessory bags. A fair and reasonable basis for apportionments to the sub-assembly of accessory bags is on the percentage of direct *266 labor expended during tbe period from August 1 to December 81,1951.

(a) Factory expense:

Apportionment to accessory tags

Plant supervisor’s salary-$3, 760. 00
Truck drivers_ 2, 321. 80
Truck expense_ 758. 67
Depreciation_ 4,160.48
Factory expense_ 1, 874. 84
Repairs and maintenance- 1,274.00
Heat, light, power and water- 2,303. 96
Taxes, other than payroll- 1, 666.34
Total_ 18,000.08 $12,222. 06
(b) General Administration 'expense:
Office salaries and wages_$8,327. 73
Tent_ 10,354.20
Insurance_ 1, 692. 47
Office supplies and stationery_ 1, 044. 00
Postage_ 321. 85
Telephone and telegraph expense- 442. 60
Legal and accounting- 84. 56
Total_ 22,167.41 $15, 051 67
Total indirect expenses- 40,167.49 27, 273. 73
142. Tbe Canova Foods, Inc., incurred no administrative salaries, but was charged $12,562.24 by plaintiff. Tbe amount was deleted from Canova Foods general expense and reapplied to tbe administrative credits of Oliver-Finnie Company. (Finding 138) Other items that were excluded from the indirect expense of Canova Foods included Worcestershire sauce expense, discounts allowed, salemen’s salaries and expenses and advertising, none of which would be properly allocable to the sub-assembly of accessory bags.
143. Plaintiff’s cost of performing the assembly of 4,617,390 C rations is summarized from the preceding findings as follows:

Finding 1SS1 1952 Totals

Direct charges_126 $285, 526.49 $23,388: 85 $308, 915. 34
Direct factory expense_ 131 24,368. 73 40. 63 24,409.39
Indirect expense_ 139 92, 636.12 23,356. 64 115,992. 70
Sub-totals 402, 531.34 46,786.15 449, 317. 49
*267 Cost of sub-assembly of accessory bags by Canova Foods,
Inc_$72,413.84
Total costs- 521,731. 33
144. Except for the elimination of plastic spoons from approximately 3,225,750 rations, the plaintiff’s costs would have been increased by $3,225.75 (finding 37).. In addition to the above performance costs, the plaintiff paid the Orkin Exterminating Company $4,200 for fumigating plaintiff’s entire plant in June 1652, after the plant was substantially cleared of all GFP. This cost was necessary to eliminate any residual infestation which existed in the cookies and crackers that were brought into and stored in the plant during 1951.
The plaintiff received payment of $360,081.24 for the C rations assembled and shipped, and sustained a loss of $165,850.09.
145. A fair and reasonable profit allowance is 10 percent of plaintiff’s performance costs, or the sum of $52,173.13.
146. In addition to its actual cost of performance of C-ration assembly, the plaintiff claims other items in connection with the alleged termination of its contract.
Claim is made for the use of plaintiff’s main building of $31,500, representing a rental value of the building for a period of 7 months at $4,500 per month. Claim is also made for the use of the Ballard building of $2,133.36, representing a rental value of this building for a period of 8 months at $266.67 per month. The plaintiff’s cost is represented by the depreciation on these buildings which is included- in the indirect costs and a portion thereof has been allocated to the cost of C-ration assembly. The fair and reasonable rental value of plaintiff’s building for the period of delay is reported in the following section of this report.
147. The plaintiff also claims $35,288.04 of its cost and loss on special equipment purchased for this contract, after depreciation and a reasonable allowance for its salvage value. The plaintiff purchased approximately $59,000 of special equipment for the assembly of C rations. The depreciation thereof has been included as an item of performance costs in finding 129 (b) herein. No part of the unused book value of this equipment is properly chargeable to the C-ration assembly.
*268 148. Plaintiff also claims settlement expense of $50,974.98 for various expenses incurred after March. 1952.
Except for $1,243.59 of payroll expense during April to June 1952, for clearing its plant of Government property, substantially all other expenses incurred or estimated relate to the prosecution of plaintiff’s claim.

Breach of Contract Olai/rn

149. The plaintiff claims excess costs and losses by reason of an alleged breach of contract by the defendant, as an alternate claim, consisting of $328,783.51 excess costs and losses, and $79,605.13 loss of profit.
The original contract called for the delivery of the completed rations during the months of June through October 1951, a period of 153 calendar days. Plaintiff’s actual delivery was completed January 24, 1952, a period of 238 calendar days from June 1, 1951. Except for substantial increases in the number of workers employed on the assembly lines and for separately screening many of the components before they were delivered to the assembly line, the delay would have extended substantially beyond the final delivery date of January 24, 1952. It is reasonable to conclude that the delay in the final delivery of C rations was attributable to the stop order deferring the final assembly to July 16, 1951, and to the excessive number of defective components which required screening and salvage operations to avoid assembling unsuitable components. The delay of 85 days in delivery of the completed rations represents 35.71 percent of the total delivery period from June 1, 1951.
Outside storage and certain other costs relate wholly to the delay in the assembly and outflow of completed rations, whereas indirect costs are allocable to the period of 85 days of delay represented by the percentage thereof to the entire delivery period.
150. The following costs and expense were wholly attributable to the delay caused by the defendant’s stop order and the necessity of screening of components and packaging materials.
(a) The plaintiff rented outside warehouses commencing *269 about June 8, 1951, and continuing until December 1951, at an actual cost of $27,051.86.
(b) The plaintiff’s payments for switching and demurrage charges in diverting incoming shipments to outside warehouses and transferring such components and materials back to the main plant for assembly amounted to $7,112.02.
(c) The cost of additional packing cases for the temporary storage of B-units assembled prior to July 16,1951, tarpaulins for outside temporary protection of G-FP at the loading docks, extra heating equipment for the assembly room and photos of defective GFP received, amounted to $1,990.87.
These items amount to $36,154.25.
151. The plaintiff’s greatest additional costs were incurred for the direct labor engaged in screening and rehandling of components and packaging materials. Most of this work was performed by employees in the assembly lines but much of it represented warehouse workers and other employees who were specifically assigned to screening and salvage operations of components which were found to contain such a great number of defects that they could not be handled in the lines. The cost for the additional employees would not comprise all of plaintiff’s increased costs of such labor, because of the slowdown in the output of the entire assembly lines. An accurate determination of such increased labor costs is not possible of determination.
152. The plaintiff employed a so-called engineered or standard labor cost as its determination of a fair and reasonable direct labor cost for the several operations, except for warehouse labor. The commercial rate of 4 cents per hundredweight for handling stored materials was employed as the reasonable rate for warehouse labor. The total amount of such labor, including the direct labor costs for the assembly of accessory bags, amounted to approximately $.026 per ration for direct labor. The plaintiff had no prior experience on standard costs in the assembly of C rations.
153. In submitting a breakdown represented by tentative estimates of its bid proposal on April 3, 1951, the plaintiff assigned an estimated cost of $.04525 for direct labor. Prior to bidding plaintiff obtained from the Chicago QM Depot an industrial preparedness study for the assembly of *270 C rations. This pamphlet set forth in great detail the assembly operations and was supported with charts and blueprints for the design of the assembly lines and packing methods.
154. After a study of this pamphlet the plaintiff set up efficient lines for its assembly operations with conveyor belts and handling equipment. The plaintiff provided for the handling of incoming components by gravity conveyors from the receiving docks down to one of the basement floor areas. From this point GFP was handled by elevators, power conveyors and other equipment to other storage areas and to the assembly lines. Plaintiff’s set-up was engineered and efficiently planned for handling the inflow of GFP and the outflow of completed rations from plaintiff’s main plant. Except for the stop order of June 5,1951, which necessitated the diversion and transfer of substantial amounts of GFP to outside warehouses, the delays in assembly in packing oversized crackers, and the screening of components, the plaintiff should have substantially improved upon its original estimate for direct labor costs.
155. Upon the completion of the delivery of all C rations by the plaintiff, the defendant’s property officer prepared a tabulation of all GFP furnished the plaintiff, units rejected by the Government inspectors as unsuitable for assembly, and the units charged to plaintiff for use in C rations assembled, with shortages to be accounted for. This accountability of property reflects that 10 items of canned fruit and meat contained unsuitable units in excess of one-half percent, which necessitated screening, sorting and survey of entire cases. Had the plaintiff packed even a small portion of these unsuitable units, this would have been sufficient cause for the rejection of the entire lots of completed rations. The excess over one-half percent of defects in said 10 items was the average excess for the entire quantity and might be substantially exceeded in individual items.
156. An approximate cost of screening and the salvage operations in the recovery for use of portions of the units set aside is 25 cents a case. The cost of screening these 10 items alone would be approximately $42,967.25.
157. Substantially all of the items of GFP furnished contained unsuitable units in much greater quantities than the *271 defects allowable in the completed rations, and some screening in the assembly lines was required for substantially all components assembled. This was reasonably anticipated and plaintiff provided containers at the assembly lines for receiving and accounting for such units. It is reasonable to conclude that the screening of canned meat and fruit items alone increased plaintiff’s direct labor at least $42,967.25.
158. The increased direct labor costs in packing oversized crackers, the inspection by plaintiff’s employees of infested cookies and crackers, the screening of sugar, milk and coffee packets, accessory bags and other GFP having excessive defects would approximate the labor costs in screening canned items. A reasonably accurate determination of the labor costs in the several items involved is not possible.
159. In the absence of any accurate accounting of the direct labor involved in the extra handling of GFP, on account of delays, and in screening of excessive defective components and packaging materials furnished by the defendant, a fair and reasonable determination of such increased costs may be measured by the increase of plaintiff’s direct labor costs over its original estimate, as follows:

Actual direct labor costs:

In the main plant assemblies_$244, 086. 02
By Canova Foods, Inc. (Accessory bags)_ 40,383.19 $284,469.21

Original estimate of direct labor:

4,617,390 C rations @ $.04525_ 208,936.90
Less labor applicable to the plastic spoons excluded in 3,225,750 rations- —3, 225. 75 205, 711.15
Increased cost of direct labor- 78, 758.06
160.Certain plant costs incurred in the assembly of C rations and directly assignable to such costs were proportionately increased by reason of the delay of 85 days in completing the delivery of C rations, which include the following:
Depreciation of assembly equipment_$9,200. 75
Supplies and line service_ 4,293.92
Rental of machines- 2, 755.36
Sundry assembly expense_ 2,416.90
Pest control_ 500.00
Total_19,166.93
*272 A reasonable portion attributable to the delay of 85 days is 35.71 percent thereof, or the sum of $6,844.51.
161. A fair and reasonable portion of the indirect costs at plaintiff’s main plant attributable to defendant’s delay of 85 days is 35.71 percent of $115,992.76, apportioned to the C ration assembly in finding 139, or the sum of $41,421.01.
The amount applicable to the Canova Foods, Inc. plant in the assembly of accessory bags is 35.71 percent of $27,273.73 apportioned to C ration assembly in finding 141 or the sum of $9,739.45.
162. The indirect costs that are apportioned in part to the delay period of 85 days, include depreciation on the plaintiff’s buildings employed for the storage and assembly of C rations. The depreciation of $6,469.89 reported in finding 138 for 1951 and 1952 was allocated to C ration assembly in the amount of $3,056.18 (75.71% for 1951 and 18.89% for 1952). The amount apportioned to the delay of 85 days is 35.71 percent thereof or $1,091.36. This sum represents plaintiff’s cost in the depreciation of its buildings during the delay period. It does not represent plaintiff’s loss of a fair and reasonable rental or use value of its buildings.
163. The plaintiff’s main building contained 7 floors with an area of 27,000 square feet on each floor. Five floors of this building, covering 135,000 square feet, were regularly occupied during the performance period for the storage and assembly of C rations. The fair and reasonable rental value of plaintiff’s type of building in Memphis, during the period of the C ration assembly, was 40 cents a square foot, or $54,-000 per annum for the 5 floors occupied. The average daily rate was $147.95 and the amount applicable to the delay period of 85 days is the sum of $12,575.75.
The plaintiff acquired the Ballard building on June 15, 1951. It was directly across the street from plaintiff’s main building and was utilized as convenient storage for GFP until about the end of December 1951, along with other outside storage warehouses. In addition to other outside storage the Ballard building was required for storage of GFP because of the great accumulation of shipments during the period prior to July 16,1951. Its use was continued until December 1951, because of delay in the assembly operations, resulting from packing of oversized crackers, infested and *273 defective components. The fair and reasonable rental value of the Ballard building for storage purposes was $266.67 per month, and the plaintiff had paid $135 rent for the first half of June 1951. The rental value for the storage use of this building, from June 15 to December 31, 1951, was $1,733.35.
The fair and reasonable value for the use of the plaintiff’s main building for the period of 85 days of delay, and for its Ballard building as additional storage, is the sum of $14,309.10. Since depreciation of $1,091.36 on these buildings has been apportioned to the delay period in the foregoing finding, the net loss of the use of these buildings is the sum of $13,217.74.
164. The plaintiff claims an increased cost of $2,735.87 by reason of the purchase of candy for its 1951 Christmas trade. This represents the excess of the purchase cost of candy over its own manufacturing cost which plaintiff was unable to apply by reason of the continued use of its plant for C ration assembly. The defendant does not contest the correctness of this amount. However, the allowance of this item, or any other specific loss resulting from the delay and plaintiff’s inability to use its plant for such other purposes, would be deductible from the fair and reasonable rental value. The loss of the use value of plaintiff’s plants cannot be compounded or duplicated.
165. The contract provided that all packing materials in which GFP was shipped to plaintiff, would vest in the plaintiff, and this material was sold as waste. The market price of this type of waste dropped substantially after October 1951. Plaintiff’s final sale of waste was made January 21, 1952. Because of delays attributable to the defendant, the plaintiff sustained a loss on a portion of these materials sold after October 1951, in the amount of $4,039.38.
166. The plaintiff paid the Orkin Exterminating Company $4,200 for fumigating its entire plant in June 1952, after the building was substantially cleared of all GFP. This cost was necessary because of infested cookies and crackers received as GFP that were stored in the building during 1951.
*274 167.A fair and reasonable approximation of plaintiff’s increased costs and losses attributable to the defendant, is the sum of $194,374.40, as set out in the following summary:

■ Finding reference

Storage, switching and other direct costs-(150) $36,154.25
Increased direct labor- (159) 78, 758. 06
Apportionment of other assembly costs-(160) 6, 844. 51
Apportionment of indirect costs: (161)
Main plant_ 41,421. 01
Canova Foods, Inc_ 9,739.45
Net loss of the rental value of buildings- (163) 13,217. 74
Loss on sale of waste_ (165) 4, 039.38
Fumigation cost_ (166) 4,200. 00
Total_ 194, 374.40

Defendants Oov/nterclaims

168. The defendant claims $89,611.10 as the fair market value of cookies and crackers which were found unfit for assembly in the C rations because of infestation, and that plaintiff be held responsible for this sum, less $104.02 recovered on sales of a small portion thereof, and an estimated salvage value, of $1,029.00 for the remainder.
Upon an appeal from a finding of the contracting officer the Armed Services Board of Contract Appeals held that plaintiff was not responsible for the infestation which rendered these goods unfit for use. The Board’s decision is supported by substantial evidence which was also presented in this case.
The plaintiff incurred substantial additional costs by performing 100 percent inspection of all of the cookies and crackers remaining in storage upon the discovery of infestation and by the removal from storage and shipment of some 11 carloads to the Federal Penitentiary at Atlanta.
169. The defendant also claims for offset the sum of $3,225.65, representing the reduction in plaintiff’s labor costs by the authorized deletion of plastic spoons from the assembly of some 3,225,750 rations, less the sum of $3,000 previously deducted from vouchers rendered by the plaintiff, as reported in finding 37 herein. This item of defendant’s counterclaim could only apply if the plaintiff had not sus *275 tained any part of its claim. The deletion of plastic spoons merely reduced plaintiff’s costs by approximately $3,225.75, which offset and reduced its losses by a corresponding sum.
170. The defendant’s property officer prepared a tabulation of all items of GFP after the completion of the plaintiff’s assembly operations wherein shortages and units damaged in the process of assembly were charged against the contractor. The difference between the number of such units and the one-half percent tolerance specified in the contract was presented as a claim against the plaintiff at the cost to Government for these items, plus 4 percent specified in the contract for any excess shortages or damages.
The property officer determined an excess of shortages and damages for 10 items of components for which a finding was made by the contracting officer. The following items constitute the claim presented by the contracting officer and the amounts for which the plaintiff is responsible upon the determination herein.

Plaintiff's Amounts responsi-claimed MUty

Pears- $23.14 $23.14
Fruit cocktail_ 3.30 3.30
Starch jelly discs- 109.39 109.39
Sugar - 449.10
Milk- 147.26
Crackers_ 427. 89
Cookies- 135.66
Plastic spoons_ 129. 80 129. 80
Lids (B-cans)_ 240.29
Laminated foil, kraft, accessory bags_ 175.71
Totals- 1,841.54 265.63
Add 4 percent_ 73.67 10. 62
Totals- 1,915.21 276.25
171. The plaintiff concedes responsibility for the first three items. The defendant’s property officer concedes that items in the foregoing claim originally charged to plaintiff on a weight basis are not properly charges to the plaintiff on a unit basis. These items include sugar, milk, crackers, cookies and B-can lids. No allowance was made for breakage of oversized crackers and other defective components in packing the same.
Sugar, milk and coffee powder came in small packets of about 1,000 per case. B-can lids were shipped to plaintiff *276 in packages of 1,000 to 1,500. Cookies and crackers were packed in cases and marked on a weight basis. None of these items were actually counted in the determination of the shortage.
The plaintiff was charged with 36,200 accessory bags of which 16,525 were unaccounted for, and 19,675 represented bags damaged in processing. The tolerance allowance was 23,087, and plaintiff was held accountable for 13,113 accessory bags having a value of $175.71. Manufacturers’ defects in 177,075 bags were not charged to plaintiff. The plaintiff experienced great difficulty in opening these bags and in the bursting of bags after they were packed. It was not reasonably possible to inspect and set aside all defective bags before attempting to use them, and it is reasonable to conclude that most of the bags damaged in the assembly process were defective and should have been so classified in this accounting. See findings 95 to 113. The claim of $175.71 for accessory bags is not a proper charge against plaintiff.
Since plastic spoons were credited to plaintiff in only those rations reported by the plaintiff with no units damaged in processing, the plaintiff is properly charged for the excessive shortage in these units.
The shortage in Government property in the amount of $276.25 is properly chargeable to plaintiff for offset.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover from defendant the sum of $193,875.49.
It is further concluded that defendant is entitled to recover on its third counterclaim against plaintiff the sum of $276.25, which sum is to be offset against plaintiff’s recovery, but that defendant is not entitled to recover on its first and second counterclaims which are dismissed.
It is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of one hundred ninety-three thousand, five hundred ninety-nine dollars and twenty-four cents ($193,599.24).